1  LAW OFFICES OF DAWN CEIZLER
   DAWN CEIZLER, Bar No. 214873
2  1990 N. California Blvd., Suite 305
   Walnut Creek, CA 94596
3  Telephone: (925) 932-8225
   Facsimile: (925) 226-4849
4
   Attorney for Plaintiff Phillips 66
5  Company

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  PHILLIPS 66 COMPANY,            )  Case No.
                                    )
12                    Plaintiff,    )  **COMPLAINT FOR BREACH OF**
                                    )  **CONTRACT AND BREACH OF**
13        vs.                       )  **GUARANTY AGREEMENT**
                                    )
    T.M.B. ENTERPRISES, INC., THOMAS )  *Unlimited General Civil*
14  HELO AND SUZANNE HELO           )
                                    )
15                    Defendants.   )
                                    )
16                                  )
                                    )
17  _____ )

18

19       Plaintiff, Phillips 66 Company ("Phillips 66") alleges against T.M.B.

20  Enterprises, Inc., Thomas Helo, and Suzanne Helo ("Defendants") as follows:

21               **GENERAL ALLEGATIONS**

22       1.    Phillips 66, by assignment from ConocoPhillips Company

23  ("ConocoPhillips"), files this Original Complaint complaining of Defendants' breach

24  of contract for failing to timely and fully pay Phillips 66.

25                      **PARTIES**

26       2.    Plaintiff, Phillips 66 Company, is a Delaware corporation with its

27  principal place of business in Houston, Harris County, Texas.

28

                              1
              **COMPLAINT FOR BREACH OF COTRACT**

3.      Defendant T.M.B. Enterprises, Inc. ("T.M.B.") is a suspended California corporation with its principal place of business in Sun Valley, California.  T.M.B. may be served with process by serving its president, Thomas Helo, at 12904 Roscoe Blvd., Sun Valley, California 91352, or at such other place as he may be found.

4.      Defendant Thomas Helo is an individual residing in Los Angeles County, California and may be served with process at his residence located at 18957 Granada Circle, Northridge, California 91326, or at such other place as he may be found.

5.      Defendant Suzanne Helo is an individual residing in Los Angeles County, California and may be served with process at her residence located at 18957 Granada Circle, Northridge, California 91326, or at such other place as she may be found.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because no defendant is a resident of the state in which Plaintiff is incorporated or maintains its principal place of business.  Phillips 66 is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Texas. Defendants Thomas and Suzanne Helo are residents of California.   Defendant T.M.B. is a corporation incorporated under the laws of California with its principal place of business in California.   The amount in controversy, without interest, cost, or attorneys' fees exceeds the amount specified by 28 U.S.C. § 1332.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) , as a substantial part of the events or omissions giving rise to the claims pleaded herein also occurred in this district.

## BACKGROUND FACTS

8.      T.M.B. operated a gas station in Sun Valley, California and purchased motor fuels and related products from ConocoPhillips.  On or about August 3, 2009, ConocoPhillips entered into a ten-year Branded Reseller Agreement with T.M.B. (the "Contract").  A true and correct copy of the Contract is attached hereto as Exhibit A.

2

Under the Contract, T.M.B. was required to purchase a minimum amount of ConocoPhillips branded motor fuel for resale and to maintain certain image and signage standards.

9.    On or about June 29, 2009, Thomas and Suzanne Helo ("Guarantors") executed a Personal Guaranty (the "Guaranty") under which they each personally guarantee the full and prompt payment of all present and future indebtedness of T.M.B. to ConocoPhillips.  A true and correct copy of the Guaranty is attached hereto as Exhibit B.

10.    T.M.B. defaulted on the Contract by failing to purchase the required minimum quantity of fuel products and by failing to timely and fully pay ConocoPhillips all amounts owed under the Contract.

11.    On or about March 31, 2011, ConocoPhillips terminated the Contract with T.M.B. for permitting the sale of non-ConocoPhillips motor fuels under the ConocoPhillips brand in breach of Section 10(g) of the Contract and for failing to accept specified credit cards, debit cards, prepaid cards, and gift certificates in breach of Section 4(b) of the Contract.

12.    On or about May 1, 2012, ConocoPhillips spun off its downstream assets into newly formed Phillips 66.  As a result, ConocoPhillips assigned all its rights, title, and interest in the Contract and the Guaranty to Phillips 66.

13.    On or about May 29, 2014, counsel for Phillips 66 sent demand letters to T.M.B. and the Guarantors which demanded full and immediate payment of all of Defendants' indebtedness to Phillips 66.  True and correct copies of these demand letters are attached hereto as Exhibit C.  As of August 1, 2014, T.M.B. owes Phillips 66 the following amount, exclusive of any applicable interest and attorneys' fees:

| | |
|---|---|
| Liquidated Damages | $363,945.21 |
| Self-Amortizing Principal | $93,782.97 |
| Self-Amortizing Interest | $2,286.76 |
| Image & Equipment Monies | $65,010.95 |

**COMPLAINT FOR BREACH OF CONTRACT**

| | |
|---|---|
| Credits | ($175,000.00) |
| | $350,025.89 |

True and correct copies of the invoices are attached hereto as Exhibit D.

14.   To date, Defendants have failed to pay the indebtedness to Phillips 66, and all conditions precedent to this claim have been performed by Phillips 66 or have otherwise occurred.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT AGAINST T.M.B. ENTERPRISES, INC.

15.   Phillips 66 incorporates herein by reference, as though fully set forth herein, the facts and allegations in all preceding paragraphs.

16.   ConocoPhillips and T.M.B. entered into the Contract related to T.M.B.'s purchase of ConocoPhillips branded motor fuel and use of ConocoPhillips' signage and other image equipment.

17.   ConocoPhillips fully performed all of its obligations under the Contract by supplying the requested products and signage and other image equipment under the Contract.

18.   T.M.B. breached Section 10(g) of the Contract by permitting the sale of non-ConocoPhillips motor fuels under the ConocoPhillips brand and Section 4(b) by failing to accept specified credit cards, debit cards, prepaid cards, and gift certificates. ConocoPhillips assigned all of its rights, title, and interest in the Contract to Phillips 66.

19.   As described herein, Phillips 66 suffered damages in a sum not less than $350,025.89 exclusive of interest and attorneys' fees as allowed by law and the operative Contract due to T.M.B.'s breach of the Contract.

### SECOND CAUSE OF ACTION
### BREACH OF GUARANTY AGAINST THOMAS AND SUZANNE HELO

20.   Phillips 66 incorporates herein by reference, as though fully set forth herein, the facts and allegations in all preceding paragraphs.

21.     On or about June 29, 2009, Thomas and Suzanne Helo executed the Guaranty in which they each unconditionally guarantee the full and prompt payment of all T.M.B.'s present and future indebtedness to ConocoPhillips.

22.     ConocoPhillips assigned all of its rights, title, and interest in the Contract and the Guaranty to Phillips 66.

23.     As described herein, T.M.B. is indebted to Phillips 66.  Despite Phillips 66's demands, Thomas and Suzanne Helo have refused to pay T.M.B.'s indebtedness to Phillips 66, thus breaching their obligations pursuant to the Guaranty.

24.     As described herein, Phillips 66 suffered damages in a sum not less than $350,025.89 plus interest and attorneys' fees as allowed by the Contract due to Thomas and Suzanne Helo's breach of the Guaranty.

## CONCLUSION AND PRAYER

25.     WHEREFORE, Plaintiff Phillips 66 Company prays that Defendants, T.M.B. Enterprises, Inc., Thomas Helo, and Suzanne Helo be cited to appear and answer for an award of actual damages against T.M.B. Enterprises, Inc., Thomas Helo, and Suzanne Helo, jointly and severally, in the amount of $350,025.89; reasonable attorneys' fees, costs, and expenses incurred herein; pre- and post-judgment interest allowed by law; and for such other and further relief the Court deems just and proper.

Dated:  March 16, 2015                          LAW OFFICE OF DAWN CEIZLER

                                                By: _____
                                                    Dawn Ceizler
                                                    ATTORNEY FOR PLAINTIFF
                                                    PHILLIPS 66 COMPANY

**COMPLAINT FOR BREACH OF CONTRACT**

# EXHIBIT A



# BRANDED RESELLER AGREEMENT

## — TMB Enterprises Inc —

## EFFECTIVE DATE
August 3, 2009

**ConocoPhillips Company**
BRANDED RESELLER AGREEMENT
# RS/855076

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | SELLING RIGHTS UNDER THE CONOCOPHILLIPS BRAND(S) AND STATION | 1 |
| 2. | TERM | 2 |
| 3. | EQUIPMENT | 2 |
| 4. | CREDIT CARDS, OTHER PAYMENT METHODS, EPOS AND NETWORK ACCESS | 3 |
| 5. | BRAND AND IMAGE STANDARDS | 5 |
| 6. | PROHIBITED USES | 7 |
| 7. | CUSTOMER COMPLAINTS | 7 |
| 8. | RIGHT TO OCCUPY STATION | 8 |
| 9. | TAXES | 8 |
| 10. | TRADEMARKS | 8 |
| 11. | MOTOR FUELS BRANDS, GRADES AND QUANTITY | 10 |
| 12. | PRODUCT IDENTIFICATION | 11 |
| 13. | DELIVERY | 12 |
| 14. | TITLE TO MOTOR FUEL AND STOCK LOSSES | 12 |
| 15. | ALLOCATION | 13 |
| 16. | PURCHASE PRICE | 13 |
| 17. | TERMS OF PAYMENT AND CREDIT REQUIREMENTS | 13 |
| 18. | NO EXCLUSIVE AREA | 14 |
| 19. | TELECOMMUNICATIONS | 14 |
| 20. | ENVIRONMENTAL COMPLIANCE | 14 |
| 21. | RECORD KEEPING AND AUDITS | 15 |
| 22. | INDEMNITY AND COMPLIANCE WITH LAWS | 15 |
| 23. | INSURANCE | 16 |
| 24. | TRANSFERS, SUBLETTING AND SALES | 18 |
| 25. | TERMINATION | 19 |
| 26. | CONOCOPHILLIPS' PURCHASE OPTION | 19 |
| 27. | LIQUIDATED DAMAGES | 20 |
| 28. | INDEPENDENT CONTRACTOR | 20 |
| 29. | NOTICE | 21 |
| 30. | FORCE MAJEURE | 21 |
| 31. | REVIEW OF AGREEMENT | 21 |
| 32. | SECTION TITLES | 22 |
| 33. | WAIVER | 22 |
| 34. | WARRANTY AND REPRESENTATION | 22 |
| 35. | CONFIDENTIALITY | 22 |
| 36. | SEVERABILITY | 22 |

37.   SECURITY INTEREST ........................................................................................................... 22

38.   LEGAL FEES ........................................................................................................................ 23

39.   MODIFICATION AND ASSIGNMENT ..................................................................................... 23

40.   CHOICE OF LAW AND VENUE ............................................................................................. 23

41.   CONTRACTING ENTITY........................................................................................................ 23

42.   NO THIRD PARTY BENEFICIARY.......................................................................................... 24

43.   ELECTRONIC SIGNATURES ................................................................................................. 24

44.   ETHICS CONFLICT OF INTEREST........................................................................................ 24

45.   BINDING EFFECT ................................................................................................................. 24

46.   EXHIBITS.............................................................................................................................. 24

47.   ENTIRE AGREEMENT .......................................................................................................... 24

**EXHIBITS**

| | |
|---|---|
| Station Location | Exhibit A |
| ConocoPhillips Brand(s) Licensed under this Agreement | Exhibit B |
| Delivery Change | Exhibit C |
| Quarterly/Annual Minimum Volume Schedule | Exhibit D |
| Branded Temperature Adjustment Agreement | Exhibit E |
| Facility Allowance Addendum, if applicable | Exhibit F |
| Gasoline and Distillate Compliance Agreement | Exhibit G |

## BRANDED RESELLER AGREEMENT
### # RS/855076

This Branded Reseller Agreement ("Agreement") dated <u>June 2, 2009</u> ("Contract Date") is by and between ConocoPhillips Company, ("CONOCOPHILLIPS"), and the individual(s) and/or entity named below ("RESELLER"):

### TMB Enterprises Inc

### *RECITALS*

WHEREAS, ConocoPhillips is engaged in the business of oil exploration, production, refining and marketing under certain ConocoPhillips trademarks, associated brands, service marks and trade names that ConocoPhillips owns and/or has right to use (hereinafter sometimes referred to as "<u>ConocoPhillips Brand</u>" or "<u>ConocoPhillips Brands</u>"), and has made a significant investment over the years in developing quality products and promoting the ConocoPhillips Brands; and

WHEREAS, CONOCOPHILLIPS owns, licenses, and franchises independent operators, dealers, resellers, and branded marketers to use the ConocoPhillips Brand in connection with the resale of motor fuels, automotive services, lubrication services and oil changes, car washes, convenience stores, and related services to the consuming public through branded service stations, which stations include the use of proprietary credit card payment system, trade secrets, specialized equipment, stylized station premises, trade dress, slogans, and identification schemes, all of which may be changed, improved, and further developed by CONOCOPHILLIPS from time to time;

WHEREAS, RESELLER recognizes that ConocoPhillips has a protectible business interest in ensuring that RESELLER'S distribution of branded ConocoPhillips products under this Agreement will be accomplished in a manner which respects the high standards, reputation and integrity of the ConocoPhillips Brand which ConocoPhillips has created over the years; and

WHEREAS, ConocoPhillips' ability to recover its costs and investment in its relationship with RESELLER are dependent on its sales of petroleum products to RESELLER under this Agreement, it is specifically understood and agreed by RESELLER that the minimum volume requirements set forth in Exhibit D hereof are reasonable and of material significance to this Agreement, and RESELLER further understands that ConocoPhillips may adjust said minimum volume requirements upon any renewal of this Agreement in order to assure an economic relationship between ConocoPhillips and RESELLER; and

WHEREAS, ConocoPhillips and RESELLER desire to set out the terms and conditions under which ConocoPhillips shall sell to RESELLER and RESELLER shall purchase from ConocoPhillips various petroleum products for resale by RESELLER under the ConocoPhillips Brand; and

WHEREAS, RESELLER'S failure to carry out its responsibilities hereunder jeopardizes the reputation of ConocoPhillips, and RESELLER acknowledges that adherence to the terms of this Agreement is a matter of mutual importance and consequence to RESELLER, to ConocoPhillips, and to all other branded ConocoPhillips resellers.

NOW, THEREFORE, in consideration of the mutual benefits to be derived by ConocoPhillips and RESELLER from the execution of this Agreement, the parties hereto agree that the above recitals are a part of this Agreement and further agree as follows:

### 1.    SELLING RIGHTS UNDER THE CONOCOPHILLIPS BRAND(S) AND STATION

(a)    As long as this Agreement is in effect and RESELLER's continuing good faith performance thereof, CONOCOPHILLIPS hereby gives RESELLER permission to use the ConocoPhillips Brand identified on **Exhibit B** and franchise (the term "franchise" used in this Agreement as such term is defined under the Petroleum Marketing Practices Act, Title 1, 15 U.S.C. §2801 et seq., ["PMPA"]) in conjunction with the advertising, distribution or sale of ConocoPhillips motor fuels, as hereinafter defined, or other products selected by ConocoPhillips for sale under the ConocoPhillips Brand identified in **Exhibit B** at the Station Location set forth in **Exhibit A** ("Station") in accordance with the provisions of this Agreement.

(b)    The franchise granted herein is for the Station only and nothing herein shall be construed as or shall be a grant of any area, market, or territorial rights; provided, however, RESELLER shall be and hereby is

permitted to advertise and solicit business for the Station within any area, market or territory, it being acknowledged and agreed to by RESELLER that other branded service station resellers, dealers, car washes, branded marketers, and CONOCOPHILLIPS itself may also advertise and solicit business within any area, market or territory inclusive of, but not necessarily limited to, the vicinity of the Station.

(c)     As long as this Agreement shall remain in effect, RESELLER shall purchase from ConocoPhillips (according to the provisions of this Agreement and the Exhibits attached hereto) and sell to RESELLER's customers gasoline, highway diesel fuel, and approved alternative motor fuels bearing the ConocoPhillips Brand listed on the ConocoPhillips Marketing website (hereinafter collectively called "Branded ConocoPhillips Products" and individually called "Gasoline", "Distillate", and "Alternative Motor Fuels", respectively).

(d)     Pursuant to CONOCOPHILLIPS' prior written consent, RESELLER may be authorized to own and operate additional service station premises displaying the ConocoPhillips Brand(s); provided, however, that said service station premises shall meet or comply with CONOCOPHILLIPS' then current standards for the resale of motor fuels, and if applicable, automotive services, lubrication services, oil changes, and other related services through branded service stations to the consuming public.

## 2.     TERM

(a)     The term of this Agreement commences on **August 3, 2009** and expires on **August 31, 2019** ("Term"), subject to the early termination provisions set forth herein.

(b)     CONOCOPHILLIPS shall have the right, but not the obligation, to offer to renew the franchise granted herein for one (1) additional term.  RESELLER may accept CONOCOPHILLIPS' renewal provided:

(1)     RESELLER shall not have been previously nonrenewed or terminated as provided under applicable law or other terms of this Agreement;

(2)     RESELLER shall, prior to the commencement of such renewal term, execute CONOCOPHILLIPS' then current branded reseller agreement which shall set forth such renewal terms and conditions;

(3)     RESELLER shall not be in default of any of the terms and provisions of this Agreement, and RESELLER shall have fully and faithfully complied with and performed all RESELLER's obligations hereunder; and

(4)     RESELLER shall, at RESELLER's sole expense, renovate, improve or upgrade the Station so as to conform with CONOCOPHILLIPS' then current ConocoPhillips Brand(s), standards and specifications.

## 3.     EQUIPMENT

(a)     Subject to the provisions of this Agreement, ConocoPhillips grants RESELLER the right to display the ConocoPhillips Brand on equipment and signage ("Equipment") at the approved Station.  RESELLER shall prominently display such ConocoPhillips Brand.  RESELLER acknowledges and recognizes ConocoPhillips' interest in all its ConocoPhillips Brands and the exclusive right of ConocoPhillips to control the use of the ConocoPhillips Brands.

(b)     RESELLER shall maintain and repair, at RESELLER's expense, all Equipment and poles displaying any ConocoPhillips Brand at Station in good condition and repair.  RESELLER further agrees to keep clean all such Equipment and promptly replace, at RESELLER's expense, all burned out or defective lamps illuminating any Equipment. ConocoPhillips reserves the right at any and all times to enter upon the Station premises to inspect any or all of the ConocoPhillips Brand to:

(i)     Determine if the obligations of RESELLER are being fulfilled hereunder with regard to the display of the ConocoPhillips Brand, and

(ii)     Maintain or repair any or all of the displayed ConocoPhillips Brand, at RESELLER's expense, in the event RESELLER fails to maintain as required.

RESELLER shall maintain all Equipment in compliance with applicable laws and shall have the Equipment meet the Brand and Image Standards (as defined herein).

(c)      As of the effective date of this Agreement, RESELLER agrees to take title to all Equipment bearing the ConocoPhillips Brand and related poles previously owned by ConocoPhillips, if applicable, and has or will execute a separate purchase agreement and Bill of Sale with ConocoPhillips.

## 4.      CREDIT CARDS, OTHER PAYMENT METHODS, EPOS AND NETWORK ACCESS

(a)      Certain terms used in this Section 4 are defined below:

Card Transaction -- means a Credit Transaction, Debit Transaction, and/or transaction involving a Prepaid Card.

Cardholder – means the person whose name appears on the card.

Cardholder Information – means all personally identifiable data about the Cardholder and relationship to the merchant bans or card associations. Cardholder Information includes, but is not limited to, account number, expiration date, names, addresses, and telephone numbers.

Communication Methods – means Dial, Satellite and/or high-speed communication methods (including without limitation Broadband methodologies approved by ConocoPhillips) for the purpose of processing Card Transactions.

ConocoPhillips Accepted Credit Cards – means Credit Cards described in the applicable ConocoPhillips Credit Card Guide, which is defined in Section 4.B below.

Credit Card -- means a card or other evidence of credit, authorizing the Cardholder to obtain goods and services on credit. It includes off-line debit cards that authorize electronic transfer of funds from the Cardholder's account but generally does not require use of the Cardholder's personal identification number.

Credit Transaction -- means the process of data capture and transaction processing that allows a consumer to use a Credit Card for payment of authorized purchases.

Debit Card -- means a card or access device issued by a financial institution that authorizes an electronic transfer of funds from the cardholder's account for payment of authorized purchases. It generally requires use of the cardholder's personal identification number and may commonly be known as an on-line debit card.

Debit Transaction -- means the process of data capture, authorization and electronic transfer of funds from the cardholder's account for payment of authorized purchases.

EPOS -- means electronic point of sale - equipment used to process credit and debit card transactions.

Gift Certificates – means a certificate available for redemption that is deposited and processed like a check via the RESELLER Station's third party banking relationship.

Network Communication Fees – means fees associated with Communication Methods used for the processing of electronic Card Transactions.

NSP -- means Network Service Provider or its assignee or successor with respect to the NSP's functions related to this Agreement.

Payment Methods – means any means of payment for goods and services described above, including future payment methods designated by ConocoPhillips from time to time in the applicable ConocoPhillips Credit Card Guide, which may be enabled through innovation such as radio frequency identification devices, biometric methods or any reasonably accepted payment methods.

PCI (Payment Card Industry) – means data security standards adopted by Visa, MasterCard, American Express, and Discover to create a global standard for the protection of Cardholder Information.

Prepaid Card -- means a retail cash card that can be activated and then redeemed at RESELLER Station. It is also known as a Stored Value Card.

Prepaid Debit Card – means a prepaid payment method utilizing debit processing methods that can be activated and then redeemed at RESELLER's Station.

Processing Fees – means fees associated with the processing of electronic and non-electronic Card Transactions.

(b)    RESELLER shall accept and honor for payment ConocoPhillips Accepted Credit Cards, Prepaid Cards, Debit Cards, Prepaid Debit Cards, and Gift Certificates at RESELLER's Station where ConocoPhillips marketing standards are maintained, as outlined in the then current ConocoPhillips Credit Card Guide, and subject to the terms thereof. The ConocoPhillips Credit Card Guide is incorporated herein by this reference and may be revised from time to time or discontinued in ConocoPhillips' sole discretion, and may be supplemented with ConocoPhillips Marketing website communications  and other forms of notification to RESELLER (all referred to collectively as the "Credit Card Guide"). RESELLER shall accept other Payment Methods presented for payment at RESELLER's Station.

(c)    ConocoPhillips shall accept assignment of ConocoPhillips Accepted Credit Card invoices from all ConocoPhillips Accepted Credit Cards, subject to the terms and conditions in the Credit Card Guide. RESELLER shall refuse to honor ConocoPhillips Accepted Credit Cards for purchases made at locations other than RESELLER's Station, and shall not assign invoices to ConocoPhillips for sales or purchases made at retail outlets not previously approved by ConocoPhillips. RESELLER shall accept and promptly reimburse ConocoPhillips for invoices refused by ConocoPhillips in accordance with the provisions of the applicable Credit Card Guide. Except as otherwise stated in this Section 4(c), assigned credit card invoices shall be automatically applied to RESELLER's outstanding account balance for product purchases and any other amounts owing to ConocoPhillips.

(d)    RESELLER shall ensure that RESELLER's Station has and uses ConocoPhillips approved Electronic Point of Sale ("EPOS") equipment in accordance with the provisions of Section 4. RESELLER shall further ensure that RESELLER's Station has and uses a current version of software for such EPOS equipment. Such approved EPOS equipment and current version of software are listed on the ConocoPhillips Marketing website, and such list may be revised from time to time in ConocoPhillips' sole discretion. ConocoPhillips reserves the right to require RESELLER, at RESELLER's expense, to purchase or lease updated approved EPOS equipment and a current version of software when revisions to the approved EPOS equipment and software list occur. RESELLER shall maintain and repair at its sole expense all EPOS equipment used at RESELLER's Station for transaction processing.

(e)    RESELLER shall receive access to a NSP designated by ConocoPhillips for on-line transactions for consumer purchases made with ConocoPhillips Accepted Credit Cards or Payment Methods. Processing requirements through the designated NSP are set forth in this Section. RESELLER agrees to process all consumer purchases of Gasoline and Distillate that use ConocoPhillips Accepted Credit Cards through the NSP designated by ConocoPhillips. For all other consumer purchases except Gasoline and Distillate, RESELLER's Station must process, at a minimum, the ConocoPhillips Brand proprietary cards (including but not limited to proprietary fleet cards and the ConocoPhillips MasterCard), Voyager and Wright Express cards through the NSP designated by ConocoPhillips. RESELLER agrees to pay Network Communication Fees and Processing Fees associated with the processing of Card Transactions electronically, which fees are set forth on the ConocoPhillips Marketing website.

(f)    Network access can be obtained through Communication Methods approved by ConocoPhillips, which ConocoPhillips may change from time to time at its discretion. RESELLER agrees to the terms and conditions and associated fees ("Communication Method Terms and Conditions") as defined on the ConocoPhillips Marketing website.  Any future Communication Methods approved by ConocoPhillips, which may or may not include Broadband methods, shall also be set forth on the ConocoPhillips Marketing website. ConocoPhillips reserves the right to require RESELLER to purchase or lease equipment necessary for and associated with such future Communication Methods, at RESELLER's expense.

(g)     RESELLER shall pay the fees and charges associated with Card Transactions at RESELLER's Station, as set forth on the ConocoPhillips Marketing website. Such fees and charges may be adjusted by ConocoPhillips periodically. ConocoPhillips shall deduct all Processing Fees and Network Fees from RESELLER's total automated sales. Subject to applicable law, ConocoPhillips may change any or all of its fees, charges or both at any time upon not less than ten (10) days' advance written notice to RESELLER.

(h)     Standards for Protection of Cardholder Information.  Except as otherwise specified, RESELLER shall:  (a) not store Cardholder Information except to facilitate Card Transactions in accordance with this Agreement and (b) comply with the then-current Payment Card Industry Data Security Standard ("PCI Standard"), which is referred to on the ConocoPhillips Marketing website.  RESELLER must protect all Card Transaction records retained pursuant to this Agreement in accordance with these data security provisions.  RESELLER agrees to use these records only for purposes of this Agreement and safeguard them in accordance with the PCI Standard. RESELLER is liable for its Station (including any or all of RESELLER's employees, agents, representatives, subcontractors, and processors) failure to comply with this Section.

(i)     Data Security Operating Policy.  RESELLER agrees to abide by all terms and conditions set forth in the ConocoPhillips Data Security Operating Policy ("DSOP"), which may be amended from time to time, and which is more fully set forth on the ConocoPhillips Marketing website.

(ii)     Notification Requirements.  RESELLER agrees to notify ConocoPhillips immediately, and confirm in writing as soon as possible thereafter, if RESELLER has reason to believe that Cardholder Information has been accessed or used without authorization or not in compliance with this Agreement. ConocoPhillips may perform an audit of the incident.  If the results of the audit show that RESELLER or its respective employees, agents, representatives, contractors or subcontractors, are at fault, RESELLER shall pay the cost of such audit.  RESELLER shall provide (and obtain any waivers necessary to provide) to ConocoPhillips and auditors of ConocoPhillips' choosing, on request, full cooperation and access to conduct a thorough audit of such data access or use incident, including providing all Card Transaction account numbers related to the incident.  RESELLER shall fully cooperate with ConocoPhillips' efforts to mitigate and rectify any issues arising from the incident, including consulting with ConocoPhillips about RESELLER's communications to Cardholders affected by the incident and providing (and obtaining any waivers necessary to provide) ConocoPhillips all relevant information to verify RESELLER's ability to prevent future incidents in a manner consistent with this Agreement.  ConocoPhillips reserves the right to suspend processing of Card Transactions for RESELLER if DSOP requirements are not met.

(iii)     No Representation by ConocoPhillips.  Except as otherwise specified in these data security provisions or DSOP, RESELLER's compliance with the DSOP shall not in any way relieve RESELLER's indemnity obligations to ConocoPhillips under this Agreement, nor relieve or decrease RESELLER's liability in any way.  RESELLER is responsible at its sole expense for providing any additional data security measures that it deems necessary to protect its particular data and interests.  ConocoPhillips does not in any way represent or warrant that the measures contained in these data security provisions or the DSOP are sufficient or adequate to protect RESELLER's particular data and interests.  CONOCOPHILLIPS HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, AND LIABILITIES WITH RESPECT TO THE DSOP, THE PCI STANDARD, AND THE DESIGNATION AND PERFORMANCE OF THIRD PARTY SECURITY ASSESSORS, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(i)     RESELLER agrees that this Section is reasonable and of material significance to this Agreement and to the consumers who patronize RESELLER's Station.  RESELLER further understands and acknowledges that it is reasonable for ConocoPhillips to debrand RESELLER's Station if it does not comply with this Section 4, or to terminate this Agreement in its entirety, upon written notice to RESELLER in accordance with the PMPA.

## 5.     BRAND AND IMAGE STANDARDS

Consistent with the principles herein set forth, including but not limited to Section 28 of this Agreement, RESELLER shall conduct its independent business operations in compliance with the standards set forth below, which will promote the continuing good reputation of ConocoPhillips and all other branded ConocoPhillips resellers, dealers, marketers and independent operators.

(a)     RESELLER shall comply with ConocoPhillips' Brand and Image standards and requirements for the ConocoPhillips Brand, which are set forth on the ConocoPhillips Marketing website and incorporated herein by this reference, and which may be revised from time to time in ConocoPhillips' sole discretion (hereinafter called "Brand and Image Standards"). RESELLER shall cause the Station to be in compliance with CONOCOPHILLIPS' Brand and Image Standards.  RESELLER shall be responsible for all costs and expenses of complying with the Brand and Image Standards, including, without limitation, all materials, permitting, construction, maintenance, improvements and equipment costs.  RESELLER shall complete the imaging of the Station for the ConocoPhillips Brand by no later than the date designated by ConocoPhillips in the Brand and Image Standards set forth on the ConocoPhillips Marketing website. RESELLER shall be responsible for all purchasing, permitting, construction, maintenance or any other costs related to completing the image improvements, equipment and other items as specified in the Brand and Image Standards.  In addition to other remedies that may be available, ConocoPhillips may terminate this Agreement in its entirety or may debrand the Station if RESELLER fails to complete the imaging of the Station as set forth in this Section 5.

(b)     All persons on RESELLER's Station must be treated fairly, honestly, and courteously, and consumer complaints must be handled in accordance with Section 7, below.  Likewise, in addition to the public, RESELLER shall conduct its operation to provide sufficient training and oversight to RESELLER's personnel at the Station.

(c)     The Station, in its entirety, including the grounds and Equipment, must be clean, in good repair, and well maintained.

(d)     The Station must complement the community and the environment.  Furthermore, RESELLER, its employees, agents or contractors, and the Station must not engage, permit, or cooperate in any conduct that reflects unfavorably on the reputation of ConocoPhillips in the community served by RESELLER, or in ConocoPhillips' opinion impairs the goodwill associated with the ConocoPhillips Brand, or constitutes a deceptive or unfair trade practice under applicable laws.  RESELLER shall cooperate, and shall take reasonable steps to ensure that the operators of the Station, its employees, vendors, contractors and agents cooperate, fully with the performance of RESELLER's obligations under this Agreement and any related or supplemental agreements. RESELLER shall not permit on, in or from the Station:

(i)     price gouging or any conduct constituting an unfair trade practice, in the sale of any product or service;

(ii)     any illegal consumption of intoxicating beverages;

(iii)     the sale or use of illegal drugs or drug paraphernalia;

(iv)     the sale of tobacco (as described further in Section 22 below) or alcoholic beverages to minors or to persons who are reasonably believed to be intoxicated or impaired; or

(v)     any offensive merchandise, action or activity (including without limitation books, magazines, video tapes, and video games that emphasize nudity) that ConocoPhillips in its reasonable judgment determines may be offensive to the general public and may bring one of the ConocoPhillips Brands into disrepute.

(e)     The Station must be operated at all times with personnel who are well groomed and wear clean, appropriate apparel.  In addition, each employee who, in the course of their employment, might be called upon to communicate with customers, law enforcement officials, fire officials, government officials and other persons who may have business dealings with the Station shall have the ability to personally understand, write and speak the English language.  RESELLER agrees no one shall be permitted to work at the Station while under the influence of alcohol or of an illegal drug.

(f)     The Station must make reasonable efforts to display and sell the ConocoPhillips Brand of motor oil.

(g)     To ensure consistent quality and brand image, the Station must participate, at RESELLER's expense, in ConocoPhillips' image evaluation/mystery shopper program, described in ConocoPhillips' Brand and Image Standards on the ConocoPhillips Marketing website. The evaluation form in use at any time during the Term of this Agreement may be obtained from ConocoPhillips, and is incorporated into this Agreement by this reference. If the Station fails an image evaluation, RESELLER shall promptly take action to correct or improve any image

deficiencies identified at the Station, which will be re-evaluated approximately thirty (30) to forty-five (45) days after such image evaluation. If the Station fails the re-evaluation, it will be debranded. It is understood and agreed that a RESELLER Station will also be debranded for habitual failures if it fails three (3) image evaluations (excluding re-evaluations) in a row based on either pass/fail Brand and Image Standards requirements or exterior/interior appearance points, even though the Station is able to pass each re-evaluation. Notwithstanding any provision to the contrary in this Agreement, this remedy for habitual failures and the counting of the three (3) failed image evaluations shall survive the renewal of this Agreement. ConocoPhillips reserves the right to amend the image evaluation/mystery shopper program set forth above or the evaluation form at any time upon thirty (30) days' written notice to RESELLER.

(h)     The Station must remain open to the public each day, during hours determined by RESELLER. If the Station is closed to the public for a period of seven (7) consecutive days, or does not offer Branded ConocoPhillips Products for sale to the public for a period of seven (7) consecutive days, ConocoPhillips shall have the right, in its discretion, to debrand the Station and remove or cause RESELLER to remove all ConocoPhillips Brands and trade dress, according to ConocoPhillips' procedures.

(i)     Any exception to the Brand and Image Standards requires the written approval of the appropriate ConocoPhillips Marketing management.

(j)     RESELLER specifically understands and agrees that the Brand and Image Standards are reasonable and of material significance to this Agreement and to the consumers who patronize RESELLER Station and that it is reasonable for ConocoPhillips to debrand any Station which does not comply with this Section, or to terminate this Agreement in its entirety, upon written notice to RESELLER in accordance with the PMPA.

(k)     RESELLER shall comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Station and the conduct of RESELLER's business at the Station.

## 6.     PROHIBITED USES

RESELLER shall not use the Station or any part thereof, without CONOCOPHILLIPS' prior written consent, for any of the following:

(1)     An automobile, truck or equipment rental business;

(2)     A vehicle towing business consisting or two (2) or more tow trucks;

(3)     A business of selling vehicles of any kind;

(4)     A parking lot; or a place for the storage of junked, disabled vehicles or used tires or batteries;

(5)     A business that involves major engine overhauls, auto body repair, welding, or any other operation that involves an open flame; or

(6)     A franchise or franchise business operated on or from the Station other than any franchise or franchise business approved by CONOCOPHILLIPS or offered by CONOCOPHILLIPS to RESELLER.

## 7.     CUSTOMER COMPLAINTS

RESELLER shall manage consumer complaints in accordance with ConocoPhillips' consumer complaint process, which is provided to RESELLER on the ConocoPhillips Marketing website. RESELLER agrees to develop consumer responsiveness programs designed to respond to and resolve consumer inquiries or complaints received directly by RESELLER in a consistent, timely and appropriate manner. For consumer inquiries and complaints received by ConocoPhillips and forwarded to RESELLER for response, RESELLER is responsible for providing feedback to ConocoPhillips, within ten (10) business days from receipt of the complaint, concerning the corrective action which RESELLER has taken or will take. If the corrective action requires more than ten (10) business days, RESELLER shall provide ConocoPhillips with status updates within each ten (10) day business period until the corrective action is complete. If timely response or update is not received from RESELLER and ConocoPhillips determines it is prudent to pay the consumer, ConocoPhillips reserves the right to invoice the RESELLER for such

amount paid to the consumer. In situations where the severity of the complaint, in ConocoPhillips' opinion, requires more timely response, the RESELLER shall respond as requested by ConocoPhillips. In situations where the consumer complaint involves allegations of abusive language, sexual harassment, discriminatory treatment, physical altercation, or personal injury, RESELLER will contact ConocoPhillips' Consumer Services group within two (2) business days. RESELLER agrees that the provisions contained in this Section are reasonable and of material significance to this Agreement.

## 8.    RIGHT TO OCCUPY STATION

RESELLER warrants and represents that RESELLER has the right to occupy the Station, either pursuant to a leasehold or by way of RESELLER's fee interest in the real property underlying the Station, for the entire Term of this Agreement. RESELLER recognizes that CONOCOPHILLIPS enters into this Agreement in reliance upon RESELLER's right to occupy real property and the Station.

## 9.    TAXES

RESELLER shall promptly pay when due all taxes levied or assessed by reason of RESELLER's operation and performance under this Agreement. RESELLER further agrees to pay State unemployment tax, State sales tax (including any sales or use tax on equipment purchased or leased), and all other taxes and expenses of operating the Station. In the event of any bona fide dispute as to the liability for taxes assessed against RESELLER, RESELLER may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. In no event, however, shall RESELLER permit a tax sale or seizure by levy of execution of similar writ or warrant to occur against the Station or any of the inventory, supplies, or equipment located thereon.

## 10.    TRADEMARKS

Pursuant to the terms of this Agreement and as long as it is in effect, CONOCOPHILLIPS hereby grants to RESELLER a non-exclusive license to use the ConocoPhillips Brand for the limited purpose of marketing, promoting, advertising and selling Branded CONOCOPHILLIPS Products. RESELLER and CONOCOPHILLIPS agree that the authorized use of the ConocoPhillips Brand is both reasonable and material to the franchise relationship. This license shall be subject to the following:

(a)    When using the ConocoPhillips Brand under this Agreement, RESELLER shall (i) use the ConocoPhillips Brand solely within the scope of the license set forth herein, (ii) use reasonable commercial efforts to enhance the goodwill value of the ConocoPhillips Brand and refrain from taking any action that could be detrimental to the goodwill value of ConocoPhillips Brand, (iii) comply with all applicable laws in force at any time and (iv) use the ConocoPhillips Brand consistent with CONOCOPHILLIPS' trademark guidelines. CONOCOPHILLIPS may review, from time to time, samples of how RESELLER is using the ConocoPhillips Brand in commerce. CONOCOPHILLIPS acknowledges that RESELLER's use of the ConocoPhillips Brand in connection with its business is consistent with the standards required by this Agreement.

(b)    RESELLER shall not use any trademark, service mark, trade name, brand name, logo, symbol, or other indicia of origin (each a "Trademark") which is confusing or substantially similar to any of the ConocoPhillips Brand(s), or authorize any person or entity to engage in such use.

(c)    RESELLER shall not use any Trademark in combination with any of the ConocoPhillips Brand(s) such that the combination reasonably may be perceived as a composite Trademark or is otherwise understood to be jointly held or used by RESELLER and CONOCOPHILLIPS or another person or entity; and RESELLER shall not use the ConocoPhillips Brand(s) (or any Trademark similar thereto) in its name or in the name of any affiliate or of any operating entity formed by it.

(d)    Nothing in this Agreement shall give RESELLER any right, title or interest in ConocoPhillips Brand(s) other than its right to use ConocoPhillips Brand in accordance with this Agreement. RESELLER shall not challenge CONOCOPHILLIPS' right, title and interest in and to ConocoPhillips Brand; challenge, contest or deny the validity of this trademark license or ConocoPhillips Brand; register or attempt to register ConocoPhillips Brand or any other trademark that may be confusingly similar to any of them; oppose or seek to cancel registration of CONOCOPHILLIPS' Trademark; or register or maintain any internet domain name containing or similar to ConocoPhillips Brand, or in any way assist others in so doing.

(e)     RESELLER agrees to notify CONOCOPHILLIPS in writing of any unauthorized use of ConocoPhillips Brand promptly as such use comes to RESELLER's attention. CONOCOPHILLIPS shall have the sole right and discretion to bring infringement or unfair competition proceedings involving the unauthorized use of ConocoPhillips Brand; and at the request of CONOCOPHILLIPS, RESELLER will cooperate (at CONOCOPHILLIPS' expense) in connection with any such proceedings.

(f)     RESELLER shall resell all motor fuels purchased from CONOCOPHILLIPS, or purchased from other parties with CONOCOPHILLIPS' prior written consent if certified to be CONOCOPHILLIPS motor fuels, under the ConocoPhillips Brand. RESELLER shall not repackage (whether in drums or otherwise) for resale any CONOCOPHILLIPS motor fuels without first (i) obtaining CONOCOPHILLIPS' prior written consent and (ii) signing a separate agreement or addendum supplied by CONOCOPHILLIPS setting forth CONOCOPHILLIPS' repackaging terms and conditions.

(g)     RESELLER shall not sell or permit the sale of motor fuels purchased or acquired by RESELLER, or by any customer of RESELLER, under the ConocoPhillips Brand, unless such motor fuels are purchased from CONOCOPHILLIPS; or if such products are certified by the supplier to be CONOCOPHILLIPS motor fuels, and such certification is approved in writing by CONOCOPHILLIPS. RESELLER shall not commingle products purchased from others with CONOCOPHILLIPS motor fuels, or sell, or permit the sale of, such commingled CONOCOPHILLIPS motor fuels under the ConocoPhillips Brand. RESELLER shall not adulterate CONOCOPHILLIPS motor fuels, sold under the ConocoPhillips Brand, with any substance. RESELLER may not sell any CONOCOPHILLIPS motor fuels under the ConocoPhillips Brand that have been mixed, blended or commingled with another product of different quality, specifications or use, unless such mixing, blending or commingling is approved in advance by CONOCOPHILLIPS in writing. CONOCOPHILLIPS shall have the right from time to time to take samples of motor fuels from the Station for testing purposes, at CONOCOPHILLIPS' option, to ensure compliance.

(h)     RESELLER shall not use, or allow the use of, any signage or other marketing, advertising, or promotional materials which use the ConocoPhillips Brand at any location operated or supplied by RESELLER, without the prior written consent of CONOCOPHILLIPS, which CONOCOPHILLIPS may rescind if circumstances relevant to its prior approval change. Marketing, advertising or promotional materials shall neither be transmitted over the Internet, nor through any electronic, digital, or any other medium now or hereinafter adopted, invented or known, unless prior written approval is first obtained from CONOCOPHILLIPS. RESELLER shall not register any domain names or other electronic identifiers, now or hereinafter adopted, which include the ConocoPhillips Brand without the prior written consent of CONOCOPHILLIPS, which CONOCOPHILLIPS may rescind if circumstances relevant to its prior approval change. RESELLER shall return each sign and all other marketing, advertising, or promotional materials, when they are no longer required at the Station, unless CONOCOPHILLIPS approves the transfer of the sign or other marketing, advertising, or promotional materials to another location and **Exhibit A** is amended to show the new location.

(i)     The Station and the dispensing equipment used for Branded ConocoPhillips Products shall be painted, lit and kept clean and legible in accordance with the Brand and Image Standards. RESELLER shall erect appropriate signs and other identification materials indicating the Station is a facility licensed for the sale of Branded COP Products, which RESELLER shall keep illuminated, clean and legible, and shall not modify, alter, obstruct or move in any way, except as previously approved of by CONOCOPHILLIPS in writing. CONOCOPHILLIPS (and or CONOCOPHILLIPS' designated agent) shall have the right, but not the obligation, to enter upon the Station from time to time to adjust, exchange, remove or add to CONOCOPHILLIPS signs and other identification materials.

(j)     The terms of this Section are reasonable and material to this Agreement. RESELLER's violation of any of the provisions of this Section 10, and RESELLER's failure to cure such breach within fifteen (15) days of written notice thereof, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(k)     Upon any termination or non-renewal of the Agreement, RESELLER shall at its sole cost and expense immediately discontinue the use of ConocoPhillips Brand in all manners, including, without limitation, on buildings, equipment, tanks, trucks, automobiles, letterheads, stationery, other marketing, advertising, or promotional materials; and shall refrain from in any way or manner, holding itself out as offering for sale or otherwise handling Branded ConocoPhillips Products.

11.    **MOTOR FUELS BRANDS, GRADES AND QUANTITY**

(a)     During the Term of this Agreement, RESELLER shall continuously stock and offer for sale sufficient quantities of each grade and type of Branded ConocoPhillips Products, generally offered by CONOCOPHILLIPS in the geographic area of RESELLER's Station, as will satisfy consumer purchase requirements on a prompt basis. CONOCOPHILLIPS shall have the right to change or discontinue, from time to time, such brands or grades of motor fuels without RESELLER's permission.

(b)     RESELLER shall purchase the quantities of Branded ConocoPhillips Products set forth herein in the Quarterly/Annual Minimum Volume Schedule attached hereto as **Exhibit D** ("Contract Volumes") from CONOCOPHILLIPS. RESELLER's failure to purchase at least eighty percent (80%) of the motor fuels requirements set forth in **Exhibit D** ("Minimum Volume") from CONOCOPHILLIPS shall, subject to RESELLER's right to cure any default or breach which may be curable as set forth hereinafter, be cause for termination or non-renewal of this Agreement by CONOCOPHILLIPS. If RESELLER has failed to meet Minimum Volume for any calendar quarterly period of this Agreement, RESELLER shall be afforded the opportunity to cure such default by taking delivery of the unpurchased volume from the prior calendar quarter plus the Minimum Volume over the six (6) month period following the calendar quarter in which RESELLER failed to purchase the Minimum Volume ("Cure Period"). In determining whether the purchase volume has been deficient for a given calendar quarter, the volumes purchased in excess of the minimum volume(s) the calendar quarter for the preceding two (2) calendar quarters, if any, shall be credited to the volume for the deficient calendar quarter. The terms of this Section are reasonable and material to this Agreement. RESELLER's violation of the provisions of this Section, and RESELLER's failure to cure such breach as provided herein, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(c)     CONOCOPHILLIPS recognizes that there may occur extenuating and uncontrollable circumstances such as, but not limited to, road construction, natural disasters, supply shortages or abnormal market conditions, that may affect the Station from selling its Contract Volume. In such cases, RESELLER may make a written request for a reasonable temporary adjustment to the Contract Volumes set forth in **Exhibit D** stating specifically the reason the adjustment is being requested. CONOCOPHILLIPS agrees to respond to all volume adjustment requests within twenty-one (21) days of receipt.

(d)     To facilitate deliveries to the Station, at CONOCOPHILLIPS' written request, RESELLER agrees to order products by such method as CONOCOPHILLIPS reasonably determines, in CONOCOPHILLIPS' sole discretion, will best achieve compliance with the requirements set forth in this Section including, but not limited to, CONOCOPHILLIPS' Automatic Replenishment Program ("ARP"). In the event CONOCOPHILLIPS elects to receive orders or stage deliveries of motor fuel products to the Station via CONOCOPHILLIPS' ARP, RESELLER hereby agrees to comply with the following procedure:

(1)     On each day of Station operations including, but not limited to, Saturdays, Sundays and holidays, RESELLER shall via a telephonic transmission procedure prescribed by CONOCOPHILLIPS, enter into CONOCOPHILLIPS' ARP the following data:

(i)     The quantity in gallons of the prior days sales of each grade of motor fuel offered for sale at the Station; and

(ii)     The quantity in gallons of the ending inventory for the prior day of each grade of motor fuel stored in the underground storage tanks at the Station.

(2)     In the event the ARP is inoperable for any reason, upon timely notice from CONOCOPHILLIPS that all orders shall be placed to CONOCOPHILLIPS' order or dispatch desk, RESELLER shall place orders to such CONOCOPHILLIPS order desk or dispatch personnel as CONOCOPHILLIPS may direct or to CONOCOPHILLIPS' Interactive Voice Response Ordering System.

(3)     RESELLER shall accept delivery at such time, by such method of delivery, and in such minimum quantities per single delivery, as CONOCOPHILLIPS shall elect. RESELLER hereby grants CONOCOPHILLIPS twenty-four (24) hour per day access to RESELLER's motor fuel storage tanks at the Station for purposes of motor fuel delivery.

(4)     In all instances, CONOCOPHILLIPS reserves the right to charge RESELLER a demurrage or administrative charge(s) in such amounts as are reasonable and customary, in the event CONOCOPHILLIPS

determines in good faith that RESELLER or any of its employees, contractors or representatives are responsible for delaying the delivery of CONOCOPHILLIPS' motor fuel to the Station including, but not limited to, a determination that the quantity of motor fuel products staged for delivery to the Station could not or should not in fact have been delivered because RESELLER failed to comply with, or erroneously reported the data to, the ARP.

## 12.    PRODUCT IDENTIFICATION

Consistent with the principles herein set forth, including but not limited to Section 28 of this Agreement, RESELLER shall conduct its independent business operations in compliance with the standards set forth below, which will promote the continuing good reputation of ConocoPhillips, the ConocoPhillips Brand(s) and all other branded ConocoPhillips resellers:

(a)     As stated in more detail herein, RESELLER may only use the ConocoPhillips Brand in connection with any advertising, distribution or sale of Branded ConocoPhillips Products or other products selected by ConocoPhillips for sale under the ConocoPhillips Brand.

(b)     RESELLER may not adulterate, misbrand or mislabel motor fuels sold hereunder.

(c)     RESELLER agrees not to sell any Branded ConocoPhillips Products under the ConocoPhillips Brand which do not contain the additives which are required by ConocoPhillips at any given time.

(d)     RESELLER understands and agrees that, except for octane blending of pure gasolines, no blended motor fuels shall be sold hereunder except as described on the ConocoPhillips Marketing website or unless otherwise previously approved by ConocoPhillips in writing.

(e)     RESELLER shall comply with all applicable petroleum product regulations, including, without limitation, those set forth in **Exhibit G** of this Agreement, as revised from time to time.

(f)     Alternative Motor Fuels must be Branded ConocoPhillips Products to be sold under the branded canopy or at any branded fuel island at the Station.   Approved Alternative Motor Fuels are listed on the ConocoPhillips Marketing website, which list may be added to or deleted from, from time to time as ConocoPhillips may determine in its sole discretion. Brand and Image Standards for Alternative Motor Fuels are described on the ConocoPhillips Marketing website, which may be revised from time to time in ConocoPhillips' sole discretion.   Any unbranded alternative fuels or alternative fuels sold as non-motor fuel shall not be in the trade dress associated with any of the ConocoPhillips Brands, shall not be sold from the motor vehicle fueling area or in close proximity thereto, and shall be clearly marked that the alternative fuel is not a Branded ConocoPhillips Product, except as otherwise provided on the ConocoPhillips Marketing website.

(g)     No off-road distillate (red dyed) shall be sold from a premises displaying any of the ConocoPhillips Brands unless the off-road distillate is supplied by ConocoPhillips or by a supplier approved in writing by ConocoPhillips.   RESELLER agrees only to deliver off-road distillate to those consumers having a legitimate need for off-road distillates and to procedures in place to prevent off-road distillate from being used in motor vehicles. Such off-road distillate shall not be in the trade dress associated with the ConocoPhillips Brands, shall not be sold from the motor vehicle fueling area or in close proximity thereto, and shall be clearly marked that the off-road distillate is not for use in motor vehicles and is not a Branded ConocoPhillips Product.

(h)     RESELLER AGREES THAT THE PROVISIONS CONTAINED IN THIS SECTION ARE REASONABLE AND OF MATERIAL SIGNIFICANCE TO THIS AGREEMENT.   RESELLER FURTHER UNDERSTANDS AND ACKNOWLEDGES THAT, GIVEN THE SERIOUSNESS OF THE VIOLATION, IT IS REASONABLE FOR CONOCOPHILLIPS TO DEBRAND THE STATION IF IN VIOLATION OF SAID PROVISIONS, OR TO TERMINATE THIS AGREEMENT IN ITS ENTIRETY, UPON TEN (10) DAYS' WRITTEN NOTICE TO RESELLER.

(i) Notwithstanding ConocoPhillips' right to debrand or terminate in the preceding section, if ConocoPhillips determines that a violation of the provisions contained in this Section has occurred, ConocoPhillips shall give RESELLER a warning and RESELLER shall make payment to ConocoPhillips of a fine of $10,000 per violating Station, via EFT.   Such fine represents a partial compensation to ConocoPhillips for the losses it incurs from lost sales and for the damage to its trademark from RESELLER's violation of the provisions contained in this Section. If another violation of the provisions of this Section occur at the Station, or the violation is continuing, RESELLER shall make payment to ConocoPhillips of a fine of $20,000 per violating Station, via EFT, and ConocoPhillips shall,

at its option, either (1) require RESELLER to debrand the Station or (2) terminate this Agreement in its entirety, whichever is applicable, upon giving RESELLER ten (10) days' written notice. ConocoPhillips reserves the right to terminate this Agreement in whole or require RESELLER to debrand the Station without first giving RESELLER a warning in the first instance in situations where ConocoPhillips, in its sole discretion, deems the violation to be so serious or widespread that a right to cure is unreasonable. If RESELLER does not pay the fine(s) set forth above, ConocoPhillips may immediately require RESELLER to debrand the Station or may terminate this Agreement in its entirety, whichever is applicable, and may take all legal action it deems appropriate to obtain payment of the applicable fine(s) and debranding costs from RESELLER if ConocoPhillips determines to debrand the Station utilizing its own personnel or contractors. RESELLER shall be responsible for payment to ConocoPhillips of all collection costs as described in Section 17 of this Agreement.

### 13.   DELIVERY

(a)   Deliveries of CONOCOPHILLIPS motor fuel shall be made at times determined by CONOCOPHILLIPS upon RESELLER's order of full truck and trailer quantities in single deliveries subject to CONOCOPHILLIPS' equipment and product availability. CONOCOPHILLIPS shall make all reasonable efforts to deliver motor fuels to the Station within twenty-four (24) hours of RESELLER's order, 365 days per year; however, CONOCOPHILLIPS shall not be required to make deliveries within forty-eight (48) hours following receipt of RESELLER order or outside of business hours or on Sunday or holidays. Subject to applicable laws and regulations, RESELLER elects for billing purposes the methods of measurements to determine quantities of motor fuels purchases as indicated on the Branded Temperature Adjustment Agreement, attached hereto as **Exhibit E**. RESELLER shall not obstruct or otherwise restrict access to the Station, or any part thereof, or block any Branded ConocoPhillips Products delivery carrier's access to the Station, storage tanks, or fill pipes.

(b)   CONOCOPHILLIPS will fill all orders with reasonable promptness, but shall not be liable for breach of this Agreement, or any losses or damages claimed to be suffered by RESELLER due to delays or failure in whole or in part to fill orders resulting from RESELLER's banking arrangements, ability for CONOCOPHILLIPS to confirm RESELLER's funds, force majeure events (as set forth in Section 30), equipment failure, shortage of labor, of crude oil, of refined products or refinery capacity, of materials, or of transportation, or any other cause beyond CONOCOPHILLIPS' reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If because of any of the foregoing causes or other actual or threatened disruption in supply, CONOCOPHILLIPS is prevented or deems it necessary to not supply the full quantities of any one or more of its products hereunder, CONOCOPHILLIPS shall have the right without liability to RESELLER to allocate the quantity deliverable hereunder to RESELLER, to its other customers for like products, and to its own requirements in such manner as CONOCOPHILLIPS may deem reasonable, or according to any required allocation program, and RESELLER shall be bound by such allocation. In no event shall CONOCOPHILLIPS be liable for loss of profits or special or consequential damages because of delay or failure to make deliveries even if it has been advised that any such damages might occur.

(c)   If RESELLER requests delivery of less than CONOCOPHILLIPS' established minimum volumes, compensatory delivery charges will be imposed at CONOCOPHILLIPS' discretion. If, at that time this Agreement is entered into, the Station is equipped for the handling of only two (2) grades of gasoline, RESELLER acknowledges and agrees that CONOCOPHILLIPS has no obligation to supply three (3) grades of gasoline to the Station. In no circumstances is CONOCOPHILLIPS obligated to make deliveries into a tank which is or is suspected of leaking.

### 14.   TITLE TO MOTOR FUEL AND STOCK LOSSES

(a)   Title to and risk of loss of CONOCOPHILLIPS motor fuel delivered by CONOCOPHILLIPS to RESELLER under this Agreement passes to RESELLER at the time the motor fuel enters the motor fuel storage tanks at the Station.

(b)   RESELLER shall make a good faith effort to advise CONOCOPHILLIPS of any claim of which RESELLER becomes aware as to quality of CONOCOPHILLIPS motor fuel delivered under this Agreement in writing within five (5) days after discovery thereof.

(c)   RESELLER shall make a good faith effort to advise CONOCOPHILLIPS of any claim of which RESELLER becomes aware as to quantity of CONOCOPHILLIPS motor fuel delivered under this Agreement in writing within ten (10) days after delivery.

15.   **ALLOCATION**

If at any time the volume of Branded ConocoPhillips Products CONOCOPHILLIPS has available for sale and delivery to its customers is, for any reason not within CONOCOPHILLIPS' reasonable control, less than the volume needed to supply its customer demands, CONOCOPHILLIPS shall allocate the volume of available Branded ConocoPhillips Products to itself and its customers under a plan and formula that CONOCOPHILLIPS determines is fair and reasonable as applied to all customers of CONOCOPHILLIPS who have a demand for such products. No allocation pursuant to this Section shall operate to extend the period of this Agreement and ConocoPhillips shall not be obligated to make available any quantities omitted due to any allocation program.

16.   **PURCHASE PRICE**

Subject to **Exhibit C**, the purchase price to be paid by RESELLER for the brands and grades of Branded ConocoPhillips Products sold and delivered to the Station shall be the price in effect for the Station at the time CONOCOPHILLIPS loads the Branded ConocoPhillips Products at its bulk plant or terminal for delivery to the Station.

17.   **TERMS OF PAYMENT AND CREDIT REQUIREMENTS**

(a)   RESELLER shall pay for CONOCOPHILLIPS' motor fuel, and all other goods and services, purchased from CONOCOPHILLIPS according to the terms and conditions established from time to time by CONOCOPHILLIPS. CONOCOPHILLIPS, for the purpose of evaluating RESELLER's financial status for credit granting purposes, will require from time to time RESELLER to provide CONOCOPHILLIPS with financial information. RESELLER agrees to promptly provide such information to ConocoPhillips. RESELLER's failure to respond to any such request or provide the requested information may result in CONOCOPHILLIPS' withdrawal or denial of credit privileges to RESELLER. If RESELLER fails to fulfill the terms of payment, fails to provide financial information or if RESELLER's financial capabilities or creditworthiness shall, in CONOCOPHILLIPS' sole judgment, deteriorate, CONOCOPHILLIPS may, without prejudice to any other lawful remedies, undertake any or all of the following:

     (1)   Defer shipments of product until payment is made in full;

     (2)   Demand payment, cash in advance, or both;

     (3)   Demand additional security, financial guaranties, or both;

     (4)   Withdraw entirely all, or partially, credit privileges; and/or

     (5)   Nonrenew or terminate this Agreement.

(b)   RESELLER may be required to maintain a security deposit as is reasonably determined by CONOCOPHILLIPS from time to time. RESELLER shall deposit any such required security deposit into a bank account with CONOCOPHILLIPS promptly upon any such request by CONOCOPHILLIPS. In the event RESELLER has any outstanding amounts due on RESELLER's account or any ancillary agreements including, but not limited to, promissory notes, amortization agreements, equipment leasing or facility modification agreements, CONOCOPHILLIPS shall have the option to apply available credit, security deposits or both to offset RESELLER debt.

(c)   No payment made to CONOCOPHILLIPS by check or by any other instrument shall contain a restrictive endorsement of any kind. A restrictive endorsement shall have no legal effect, and shall not be claimed to be an accord and satisfaction of any account or balance due and owing from RESELLER, even if the instrument restrictively endorsed is processed for payment and CONOCOPHILLIPS retains the proceeds.

(d)   All payments and other fees or charges due from RESELLER shall be made through and in accordance with ConocoPhillips' preauthorized payment system (<u>EFT</u>) or in a manner otherwise designated by ConocoPhillips. CONOCOPHILLIPS reserves the right to require RESELLER to make or receive payments for other additional types of transactions. RESELLER agrees to provide the necessary authorization and assistance to implement such additional EFT's promptly upon the request by CONOCOPHILLIPS.

(e)     ConocoPhillips may assess a delinquency charge on all overdue sums owing to ConocoPhillips. Such delinquency charge shall be determined in accordance with applicable law.

(f)     ConocoPhillips may assess an administrative fee for accounts that require additional payment administration, such as but not limited to accounts that do not qualify for normal EFT terms.

**If ConocoPhillips refers RESELLER's account for collection, RESELLER agrees to pay all collection costs permitted by applicable law, including any and all reasonable attorneys' fees, court costs, and allowable interest necessary to secure collection, in addition to the outstanding balance.**

## 18.   NO EXCLUSIVE AREA

RESELLER and CONOCOPHILLIPS hereby agree that nothing herein, shall be construed as giving RESELLER an exclusive right to sell in any area.   CONOCOPHILLIPS reserves the right to sell its motor fuel, whether branded or unbranded, or any other product anywhere, by any means, and in any area, including in the area or market in which the Station is located.

## 19.   TELECOMMUNICATIONS

CONOCOPHILLIPS reserves the right, from time to time, to require RESELLER to obtain telecommunications equipment for the processing and transfer of business data between CONOCOPHILLIPS and RESELLER.  Data received or transmitted over such equipment may include, but is not limited to, the following: pricing information, credit card processing information, fuel delivery scheduling information, and other information deemed by CONOCOPHILLIPS to be necessary for the facilitation of the business set forth in this Agreement. Telecommunication equipment includes, but is not limited to, the following: electronic facsimile machines, personal computers equipped with telephone modems, satellite transmission and receiving equipment and Card Reader In Dispenser (CRIND) equipment. RESELLER agrees to obtain said equipment at RESELLER's sole expense, as well as pay any monthly fees for equipment or services, unless otherwise specified by CONOCOPHILLIPS. CONOCOPHILLIPS agrees to provide RESELLER at least sixty (60) days prior written notice of any equipment or service requirement relating to this Section.

## 20.   ENVIRONMENTAL COMPLIANCE

(a)     RESELLER agrees to comply with the provisions of **Exhibit G**, Gasoline and Distillate Compliance Agreement.  RESELLER further agrees to become informed about, comply and cooperate with and abide by all local, State and Federal laws, statutes, regulations and ordinances related to environmental protection, compliance, regulations or requirements, whether currently in effect or which may come into effect in the future, pertaining to the Station or to this Agreement,  including, but not limited to:

(1)     The Resource Conservation and Recovery Act, as amended, 42 USC 6901, et seq., the Clean Water Act, as amended, 33 USC 1251, et seq., the Clean Air Act, as amended, 42 USC 7401, et seq., and the Safe Drinking Water Act, as amended, 42 USC 300 f, et seq.;

(2)     The generation, handling, transportation, treatment, storage or disposal of solid or hazardous wastes.  RESELLER agrees to implement appropriate recycling, waste management and waste minimization practices and procedures;

(3)     The Environmental Protection Act with special attention to the regulations governing the labeling, storage, dispensing and sale of gasoline or distillates;

(4)     Permits or licenses required, which  RESELLER shall procure and maintain at its sole expense; and

(5)     The underground storage tank ("UST") system compliance requirements.

## 21. RECORD KEEPING AND AUDITS

(a)     RESELLER shall maintain permanent and complete records as required by law or this Agreement. RESELLER shall permit such inspection of RESELLER's business operations by ConocoPhillips, its employees and agents, as may reasonably be required to determine whether RESELLER is in compliance with the Agreement. To ensure the integrity of Branded ConocoPhillips Products and the proper use of ConocoPhillips Brands, ConocoPhillips reserves the right to take samples, to take meter readings, and to inspect bills of lading and other relevant records during business hours at RESELLER's place of business or at the Station. RESELLER shall ensure on a timely basis that RESELLER, its employees and agents, as well as ConocoPhillips, its employees and agents, are permitted to inspect the Station (excluding all subsurface equipment) in RESELLER's and/or ConocoPhillips' discretion, as may be reasonably required to determine whether the Station meets the standards under this Agreement. At ConocoPhillips' request, when the integrity of Branded ConocoPhillips Products or the use of the ConocoPhillips Brand(s) is in question, RESELLER shall provide to ConocoPhillips, within five (5) business days of ConocoPhillips' request, copies of motor fuel deliveries received, motor fuel sales, credit card receipts, dispenser readings, and any other relevant records regarding the Station under investigation, at RESELLER's expense. RESELLER shall cooperate fully and completely throughout the audit or inspection processes, and ensure that the operators of the Station cooperate fully and completely. If requested by CONOCOPHILLIPS, RESELLER shall provide sales records, and a statement of their accuracy and completeness signed and verified before a notary public, to CONOCOPHILLIPS. The provisions of this Section shall survive termination, nonrenewal or expiration of this Agreement.

## 22.     INDEMNITY AND COMPLIANCE WITH LAWS

(a)     **RESELLER hereby agrees to indemnify, defend and hold harmless ConocoPhillips, and its affiliates, and its and their officers, directors, employees, agents, and representatives, from any and all claims, demands, suits, actions or other loss or liability, including all reasonable attorney's fees and legal expenses, fines, and penalties (hereinafter collectively the "Liabilities"), arising out of any claim or cause of action at law or in equity, or any administrative or judicial action, concerning or relating to any loss, loss of use of, remediation of, or damage to property or natural resources (including, but not limited to, that arising from storage tank leaks or spills, waste disposal, or air emissions), compromise of any data (including but not limited to Cardholder Information), personal injuries, death, violation of any governmental laws, regulations, or orders or patent or trademark infringement or environmental claims arising in any manner out of RESELLER's operations, including but not limited to, the storage, transportation, handling, sale, or use of motor fuel sold hereunder, or from RESELLER's performance or failure to perform under this Agreement, whether or not RESELLER was negligent or otherwise at fault. Provided, however, such indemnification obligations shall not apply:**

(i)     **To the percentage of such Liabilities, if any, attributable to ConocoPhillips' negligence or willful misconduct, or**

(ii)     **When such Liabilities are caused by defects in the Branded ConocoPhillips Products not caused or contributed to by any act or omission of RESELLER or RESELLER's employees, contractors, or agents.**

(b)     ConocoPhillips shall have the right, but not the duty, to participate in the defense of any claim or litigation with attorneys of ConocoPhillips' selection. Once RESELLER has assumed the defense of ConocoPhillips, ConocoPhillips shall have the right to participate in the defense of the claims or litigation, but it shall do so at its own expense.

(c)     RESELLER agrees to acquaint itself and strictly comply with all applicable federal, state, and local laws, regulations, orders and ordinances relating to RESELLER's business, including but not limited to compliance with laws regarding youth access to tobacco. **RESELLER hereby agrees to indemnify, defend and hold harmless ConocoPhillips, and its affiliates, and its and their officers, directors, employees, agents, and representatives, from any and all Liabilities arising out of RESELLER's or the Station's failure to observe, or violation of, such laws, regulations, orders and ordinances.**

(d)     Pursuant to the requirements of the Assurance of Voluntary Compliance entered into on December 21, 2005, by and among ConocoPhillips and 40 State Attorneys General, ConocoPhillips has agreed to take the following actions and obtain agreement of its marketers and licensees to take certain actions intended to reduce

youth access to tobacco through retail outlets operating under the ConocoPhillips Brands. Therefore, with the intention of ensuring compliance with the foregoing Assurance of Voluntary Compliance, ConocoPhillips and RESELLER agree to do the following:

(i)    Once per year, ConocoPhillips shall provide written correspondence to RESELLER (which may be sent electronically) reminding RESELLER of the importance of preventing underage sales of tobacco products and the seriousness of complying with laws regarding youth access to tobacco, and noting the fact that failure to comply with such laws could constitute grounds for termination or nonrenewal of RESELLER's right to operate under any of the ConocoPhillips Brands at the non-complying Station.

(ii)    RESELLER shall have the opportunity to participate in ConocoPhillips' tobacco compliance program for its Station at RESELLER's expense. The signatory Attorneys General have agreed not to institute legal proceedings under their respective consumer protection statutes and other laws related to sale of tobacco to minors, insofar as those proceedings are based on any tobacco sales that are made during compliance checks conducted pursuant to such a tobacco compliance program,   Likewise, ConocoPhillips shall not use information from such compliance checks as the basis for termination or nonrenewal of RESELLER or debranding of RESELLER's Station.

(iii)    Violations of laws regarding youth access to tobacco may constitute grounds for termination or nonrenewal of this Agreement or the debranding of RESELLER's Station. ConocoPhillips shall give appropriate consideration under the circumstances in its discretion to tobacco violations, if any, by RESELLER.

(iv)    RESELLER agrees to and shall notify ConocoPhillips in writing within five (5) business days of any notices of violation received from local, state, or federal authorities concerning the sale of tobacco to minors.

(e)    RESELLER's obligations in this Section shall survive any termination or nonrenewal of this Agreement.

## 23.    INSURANCE

(a)    In addition to and without limiting any warranty and indemnity contained elsewhere in this Agreement, RESELLER shall, as a separate obligation, carry and pay for insurance of the types and in the minimum amounts as follows covering items, risks, and operations related to or required to fulfill this Agreement:

(1)    Throughout the Term of this Agreement:

(A)    Workers' Compensation Insurance or similar insurance, including all such insurance as may be required or permitted by all applicable state and Federal workers' compensation laws, and by such other laws as may be applicable to RESELLER's performance under this Agreement.

(B)    Employer's Liability Insurance, including marine operations if applicable, with amounts required by law or not less than $1,000,000 any one occurrence, whichever is the greater.

(C)    Commercial General Liability Insurance on an "Occurrence Form" with a combined single limit of not less than $1,000,000 per occurrence, $2,000,000 aggregate, including coverage for (A) premises and operations, (B) products and completed operations, (C) explosion, collapse and underground damage, (D) contractual liability, and (E) sudden and accidental pollution liability.

(D)    Business Automobile Liability Insurance covering liabilities for the death of or injury to any one person and liabilities for loss of or damage to property resulting from any one accident with combined single limit of not less than $1,000,000 per occurrence.

(E)    Garagekeepers Legal Liability Insurance, if applicable, covering customer's vehicles in RESELLER's care, custody and control, including coverage for loss by fire, explosion, theft, vandalism, and/or malicious mischief and collision or upset with a minimum limit of $50,000 each occurrence;

(F)     Liquor Liability Insurance covering, if applicable, liabilities arising from RESELLER's sale of alcoholic beverages from the Station with a minimum limit of $1,000,000 per occurrence; and

(G)     To the extent reasonably available and commercially affordable, Environmental Pollution Liability Insurance and/or Environmental Impairment Liability Insurance which specifically covers, but is not limited to, leaks occurring from underground tanks and piping system, whether they are sudden or gradual, with coverage extending to any and all expenses of clean-up or recovery, including excavation of contaminated soil, in an amount not less than $500,000 combined single limit of liability.

(i)     RESELLER shall carry or require owners to carry the following insurance on any marine vessels employed by RESELLER in operations hereunder:

(ii)     Full Conditions Hull and Machinery Insurance in an amount equal to the agreed value of the vessel.

(iii)     Full Conditions Protection and Indemnity Insurance including pollution, collision liability, removal of debris, and towing liability in an amount not less than $10,000,000 per occurrence or the agreed value of each vessel owned or chartered by RESELLER, whichever is greater. If such insurance contains an "as owner" clause or other language purporting to limit coverage to liability of an insured "as owner of the vessel", such limitation of coverage shall not apply to ConocoPhillips in its capacity as an insured under the policy's "misdirected arrow coverage".

(iv)     Coverage in an amount not less than $10,000,000 for liability under the Jones Act, Death on High Seas Act, and General Maritime Law.

(v)     Protection against liability of employer to provide transportation, wages, maintenance, and cure for any maritime employees.

(vi)     Removal of wreck insurance covering removal of any vessel or equipment or debris therefrom the worksite and ConocoPhillips' premises.

(2)     RESELLER shall carry or cause to be carried Aircraft Liability Insurance, including Passenger Liability Insurance, on any aircraft it may employ in operations hereunder. Such insurance shall be maintained with a minimum of at least $10,000,000 any one accident and the passenger liability shall be at least $1,000,000 any one passenger.

(b)     RESELLER shall in addition to and without limitation of the requirements of Section 23 above, cause the insurance policies described in Section 23(a)(1)(C) and (D) above, to include ConocoPhillips, its employees, officers and directors and its affiliates and coventurers, and the officers and directors of such companies and coventurers as Additional Insureds with a Cross Liability clause (Separation of Interests). All insurance required hereunder and provided by RESELLER shall be primary to any other insurance coverage available to ConocoPhillips and shall apply and be in full force and effect regardless of other insurance. RESELLER shall furnish to ConocoPhillips upon request a copy of any of the required insurance policies, including all riders or endorsements; provided, however, that neither review nor failure to review such policies shall constitute acquiescence thereto or be deemed to waive or diminish ConocoPhillips' rights.

(c)     RESELLER shall cause insurers under the above policies to waive for the benefit of ConocoPhillips (i) any right of recovery which the insurer may have or acquire against ConocoPhillips, its affiliates or coventurers, or its or their employees, officers or directors for payments made or to be made under such policies and (ii) any lien or right of subrogation which the insurer may have or acquire for payments made or to be made to any person or entity who asserts a claim against ConocoPhillips, its affiliates or coventurers, or its or their employees, officers or directors.

(d)     Following execution of this Agreement, RESELLER shall furnish ConocoPhillips with certificates of insurance that demonstrate RESELLER's compliance with this Section. Such certificates shall contain a statement that the insurance coverage shall not be materially changed or canceled without at least thirty (30) days prior written

notice to ConocoPhillips. Certificates shall be forwarded to ConocoPhillips as advised in Section 29, Notices, unless otherwise instructed by ConocoPhillips.

(e)    Insurance coverage provided by RESELLER under this Agreement shall be supplied on policy forms and by insurers reasonably acceptable to ConocoPhillips. RESELLER's obligations and liabilities under this Agreement, including its indemnification obligations, shall not be limited or relieved by RESELLER's compliance or noncompliance with these insurance-related provisions.

## 24.    TRANSFERS, SUBLETTING AND SALES

(a)    RESELLER may not sell, assign, or transfer this Agreement or any rights hereunder, in whole or in part, without CONOCOPHILLIPS' prior written consent, which consent shall not be unreasonably withheld or delayed. This Agreement may not be assigned by operation of law. Any attempt by RESELLER to sell, assign or transfer this Agreement, or any rights hereunder, without CONOCOPHILLIPS' prior written consent shall be void and of no force and effect.

(b)    The foregoing notwithstanding, provided RESELLER shall be in full compliance with all the terms and provisions of this Agreement, RESELLER may transfer this Agreement and RESELLER's rights hereunder to a corporation in which the RESELLER owns beneficially and of record, and shall continue to own, beneficially and of record throughout the term of this Agreement more than fifty percent (50%) of the capital stock and voting power of such a corporation. Prior to such acquisition, an appropriate resolution shall be duly adopted by such corporation acknowledging the foregoing requirement of ownership and regulating the issuance, assignment, transfer, sale or other disposition of the corporation's capital stock accordingly, and the contents of such resolution shall be reflected in the corporation's records and noted conspicuously on all stock certificates issued by the corporation. At least thirty (30) days prior to such transfer, CONOCOPHILLIPS shall be notified immediately following said resolution in writing of same. Upon any such transfer, and from time to time thereafter, RESELLER shall execute such instruments, including personal or corporate guarantees of the obligations of the corporation to which this Agreement and the rights hereunder have been transferred, as may be requested by CONOCOPHILLIPS in CONOCOPHILLIPS' sole judgment.

(c)    Upon the death or incapacity of RESELLER, if RESELLER is not incorporated, the rights granted under this Agreement may be transferable as provided by State or Federal law, or, if no valid State or Federal law shall be applicable, to the adult child or legal spouse of RESELLER, provided arrangements have been made satisfactory to CONOCOPHILLIPS for the continued active and competent management of the Station in compliance with all of the terms of this Agreement, including without limitation the qualification of said adult child or spouse as a CONOCOPHILLIPS reseller. Upon the death or incapacity of the controlling stockholder or stockholders, if RESELLER is incorporated, this Agreement will continue in effect, provided the active management of the Station continues in a manner which fully and completely complies with all of the terms of this Agreement.

(d)    Subject to such limitations or prohibitions imposed by the PMPA or by State statute where PMPA does not pre-empt, this Agreement is personal to RESELLER and RESELLER will not without the prior written consent of CONOCOPHILLIPS (which consent shall not be unreasonably withheld or delayed): (1) assign, mortgage, encumber, or otherwise transfer this Agreement or the interest hereby created; (2) become associated with any other person as a partner or otherwise with respect to this Agreement, or (3) permit any other person, firm or corporation to occupy the Station or any part thereof; except as may otherwise be required by law. If RESELLER seeks CONOCOPHILLIPS' consent for any of the foregoing RESELLER shall contemporaneously provide CONOCOPHILLIPS with all pertinent documentation relating thereto.

(e)    If not prohibited by applicable law, if RESELLER receives a binding offer to assign or otherwise transfer this Agreement, the RESELLER's interest hereunder, or binding offer to convey, transfer, assign or alienate RESELLER's interests in the Station or RESELLER's interest hereunder which offer RESELLER desires to accept, RESELLER shall notify CONOCOPHILLIPS in writing of all terms and conditions of such offer, and CONOCOPHILLIPS shall have a right of first refusal and the option to acquire RESELLER's interest on such terms and conditions. If CONOCOPHILLIPS desires to exercise its right of first refusal, RESELLER's right to assign or otherwise transfer shall be subject to the provisions of hereof. If RESELLER sells, transfers or assigns RESELLER's interest in the Agreement to a corporation in which RESELLER has controlling interest and RESELLER offers in writing to personally guarantee the corporation's performance of RESELLER's obligations under this Agreement, CONOCOPHILLIPS' rights of first refusal under this shall not apply.

### 25. TERMINATION

(a)     RESELLER shall have the absolute right to non-renew this Agreement without cause at the end of the Term by giving ConocoPhillips written notice at least ninety (90) days in advance of such non-renewal date.

(b)     ConocoPhillips shall have the right not to renew this Agreement at the end of the Term and the right to terminate this Agreement at any time during the Term upon ninety (90) days' written notice, or upon a lesser period of notice where ninety (90) days' notice is unreasonable, for any of the grounds permitted by the PMPA.

(c)     Nonrenewal or termination of this Agreement under this Section or any other Section shall not discharge RESELLER from any liability of RESELLER to CONOCOPHILLIPS accruing under this Agreement.

### 26. CONOCOPHILLIPS' PURCHASE OPTION

(a)     RESELLER, for itself, its successors and assigns, hereby grants CONOCOPHILLIPS, for itself, its successors and assigns, the right and option of purchasing all of RESELLER's right, title and interest in the Station ("Purchase Option"), during the Term of this Agreement upon the occurrence of any one (1) of the following events:

(1)     Reseller's termination of the Agreement, unless due to an uncured breach of the Agreement by ConocoPhillips; or

(2)     ConocoPhillips' termination or nonrenewal of the Agreement and the franchise relationship created thereby for any reason or grounds permitting such termination or nonrenewal of the franchise relationship by a franchisor, pursuant to the PMPA, except if such termination or nonrenewal results from: (i) ConocoPhillips' determination to withdraw from the marketing of branded motor fuels in the relevant geographic market which includes the Station; (ii) any condemnation or other government taking of the Station; (iii) ConocoPhillips' loss of the right to use the trademarks authorized for Reseller's use under the Agreement; or (iv) the complete destruction of the marketing premises or the Station by an event or events beyond Reseller's reasonable control.

(b)     RESELLER shall give CONOCOPHILLIPS sixty (60) days prior written notice of the occurrence of such event and CONOCOPHILLIPS shall have the right to exercise its Purchase Option. Failure to exercise the Purchase Option within the sixty (60) days, from the date CONOCOPHILLIPS receives notice, shall constitute a waiver by CONOCOPHILLIPS of its right to exercise its Purchase Option with respect to the circumstances in issue at the time, but shall not constitute a waiver of CONOCOPHILLIPS' Purchase Option as to any or all future events.

(1)     Price. The purchase price for the Property shall be the fair market value of the Property (land and improvements) as a Service Station use on the Notice Date (the "Purchase Price"). During the first forty five (45) days after the Notice Date, Buyer and Seller, at their sole expense, shall each obtain an appraisal of the Property (land and improvements), as a Service Station use, from an MAI certified commercial real estate appraiser with no less than ten (10) years' experience in appraising Service Station properties, and in the area in which the Property is located, and promptly upon receipt thereof, deliver a copy of such appraisal to the other party.

(2)     Price Arbitration. If the two Service Station use appraisals differ by ten percent (10%) or less, the average of the two appraised values shall be conclusively established as the Purchase Price. If only one party obtains and delivers to the other party an appraisal of the Property, the value set forth in that appraisal shall be conclusively established as the Purchase Price. If the two appraisals differ by more than ten percent (10%), Buyer and Seller shall promptly meet and confer in good faith to negotiate the Purchase Price. If Seller and Buyer are unable to agree as to the Purchase Price within fifteen (15) days, following such good faith negotiations, the two appraisals shall be submitted to a third appraiser mutually acceptable to the parties (or if the parties cannot agree upon a third appraiser, to the presiding judge of the Superior Court in the county in which the Real Property is located). The third appraiser (or judge) shall review the appraisals and within twenty (20) calendar days after submission of the appraisals, shall select the appraised value set forth in either the Seller's appraisal or the Buyer's appraisal as the Purchase Price. The party whose appraisal is not selected shall be responsible to pay all costs of the third appraiser.

(c)     Escrow. CONOCOPHILLIPS may establish an escrow with an escrow agent of its choosing to gather documents, to arrange for the issuance of a title insurance commitment and title insurance policy and to administer the closing of the purchase. CONOCOPHILLIPS shall provide RESELLER with identifying information regarding the escrow agent.

(d)    Entry to Station. RESELLER hereby grants CONOCOPHILLIPS the right to enter upon the Station at reasonable times to perform any investigation it deems advisable, except that CONOCOPHILLIPS shall not perform any subsurface testing at the Station.

(e)    Closing. The close of escrow ("Purchase Closing Date") shall occur at the office of the escrow agent on or before one hundred twenty (120) days after the Notice Date. On or before that date, CONOCOPHILLIPS shall deliver to escrow agent: (1) the full Purchase Price plus prorations as set forth below; and (2) an executed settlement statement and any other closing documents reasonably requested by escrow agent. On or before the Purchase Closing Date, RESELLER shall deliver to escrow agent for delivery to CONOCOPHILLIPS at the closing: (i) an executed and acknowledged special warranty deed conveying the Station to CONOCOPHILLIPS free and clear of all monetary liens and subject only to customary patent reservations; building, use and zoning restrictions; rights, reservations and easements of record; and real estate taxes not yet due and payable; (ii) an executed bill of sale conveying any personal property on the Station to CONOCOPHILLIPS; and (iii) an executed settlement statement, non-foreign affidavit and any other closing documents reasonably requested by escrow agent.

(f)    Escrow agent shall apply the Purchase Price first to clear monetary liens against the Station (including accrued real property taxes and assessments not then due and payable), then to RESELLER's closing costs (including without limitation, the cost of a standard coverage owner's policy of title insurance in the amount of the Purchase Price and one-half of the escrow fee), then to RESELLER. Taxes and other expenses and income of the Station shall be prorated to the Purchase Closing Date. Except as set forth above, all closing costs shall be paid by the parties in accordance with local custom.CONOCOPHILLIPS and RESELLER shall execute and record a Memorandum of Purchase Option to provide record notice of the rights arising under this Section and a Memorandum of Right of First Refusal to provide record notice of the rights arising hereunder.

## 27.    LIQUIDATED DAMAGES

(a)    The parties agree and acknowledge that CONOCOPHILLIPS has expended significant efforts and expense in securing the rights to use the ConocoPhillips Brand(s) that are licensed to RESELLER under this Agreement, and CONOCOPHILLIPS will further expend significant efforts and expense to produce and deliver or otherwise secure a supply of branded motor fuels for resale by RESELLER under said ConocoPhillips Brand(s). RESELLER further acknowledges that the ConocoPhillips Brand(s) licensed to RESELLER have unique value and impart   goodwill value to the business of RESELLER.   RESELLER agrees and acknowledges that CONOCOPHILLIPS will be harmed by loss of sales to RESELLER in the event RESELLER does not purchase the contractually required Minimum Volumes set forth in this Agreement, or otherwise terminates this Agreement before the end of the Term hereof, or CONOCOPHILLIPS must suspend deliveries to the RESELLER because of RESELLER's breach in proportions /amounts that neither CONOCOPHILLIPS or RESELLER are able to reasonably determine.   Therefore, in the event RESELLER fails or refuses to perform hereunder, and thereby this Agreement is terminated prior to the expiration of the stated Term (excepting termination by the RESELLER  based upon the breach or default by CONOCOPHILLIPS and CONOCOPHILLIPS' failure to cure such breach or default), or RESELLER is otherwise in breach hereof as a result of which CONOCOPHILLIPS suspends deliveries of motor fuel, RESELLER agrees that CONOCOPHILLIPS shall be entitled to liquidated damages as stipulated below. These liquidated damages for RESELLER's failure to purchase the required Minimum Volumes under this Agreement, are in addition to any other damages or equitable relief available to CONOCOPHILLIPS, for breach of RESELLER's obligations under this Agreement, and shall not bar CONOCOPHILLIPS from seeking damages under any other agreements with RESELLER including, but not limited to, promissory notes or amortization agreements. The parties agree that the damages stipulated below are a reasonable estimation of the amount of such damages as of the date of this Agreement and are not a penalty.

(1)    Liquidated damages payable to CONOCOPHILLIPS under this Section shall be an amount calculated by multiplying **$.03** times the minimum monthly gallons CONOCOPHILLIPS reasonably expects to be purchased by RESELLER as specified in this Agreement, times the number of months remaining in the Term of this Agreement, including any fraction of a month, commencing as of the time of the breach, refusal to perform, or termination, whichever is earlier.  This amount of liquidated damages is due and payable as of the date of said breach, termination, or failure to perform, whichever date is earlier.

## 28.    INDEPENDENT CONTRACTOR

RESELLER is, and shall remain at all times, an independent contractor hereunder.  It is agreed that none of the provisions of this Agreement reserves, or shall be construed as reserving to CONOCOPHILLIPS any right to exercise control over the business or operations of RESELLER upon the Station or to direct, in any respect, the

manner in which such business and operations shall be conducted (including the price at which products and merchandise are to be sold), it being understood and agreed that the entire control and direction of such activities shall be and at all times remain with RESELLER. RESELLER shall have no authority to employ any persons as employees, or agents, for or on behalf of CONOCOPHILLIPS for any purpose, and neither RESELLER, nor any other persons performing any duties or engaging in any work at the request of RESELLER shall be deemed to be the employees or agents of CONOCOPHILLIPS. RESELLER shall not erect or permit any sign, insignia, or other advertising device, upon or near the Station which would in any way indicate or imply that CONOCOPHILLIPS is the owner or operator of the Station.

### 29.   NOTICE

(a)        Any notice in connection with this Agreement required by the PMPA shall be made in writing and sent by certified mail or personal delivery to the attention of:

> Marketing Contract Administration
> ConocoPhillips Company
> 411 S. Keeler Ave., 990-01 Adams Building
> Bartlesville, OK 74004

and to RESELLER at its address above noted, or at such other address as either party notifies the other in writing. The deposit in the United States mail of a properly addressed and postage pre-paid communication shall be deemed delivery to the party addressed.

Where the notice concerns termination or nonrenewal of this Agreement, the notice shall contain:

(i)        A statement of intention to terminate or not to renew, together with the reasons therefor;

(ii)       The date on which such termination or nonrenewal will take effect; and

(iii)      A copy of the Summary of Title I of the Petroleum Marketing Practices Act, prepared and published by the Secretary of Energy.

(b)       All other notices between RESELLER and ConocoPhillips shall be in writing either on the ConocoPhillips Marketing website or by e-mail, facsimile, U. S. mail, overnight courier or personal delivery to the offices indicated above. RESELLER and ConocoPhillips shall advise each other of accurate e-mail addresses.

### 30.   FORCE MAJEURE

No failure or omission by either party in the performance of any obligation of this Agreement shall be deemed a breach of this Agreement nor create any liability for damages if same shall arise from any cause or causes beyond the reasonable control of a nonperforming party including, but not limited to, the following which for the purposes of this Agreement, shall be regarded as beyond the control of the parties: acts of God, acts of Federal, State or local governments or agencies, compliance with requests, recommendations, rules, regulations or orders of any governmental authority or any officer, department, agency or instrumentality thereof, fire, storm, riot, sabotage, strikes, lockouts, disputes or differences with workers, accidents, equipment failure, reduction or unavailability of refined products or refinery capacity, failures or delays in transportation, or exhaustion, reduction or unavailability of petroleum products at the source of supply from which deliveries are made hereunder, or exhaustion or reduction or unavailability or delays in delivery of any product or material necessary in the manufacture of petroleum products deliverable hereunder, including crude oil, natural gas supplies and raw materials.   In the event that either party finds it necessary to assert the existence of the foregoing force majeure, the Term of this Agreement shall not be extended for the duration of the force majeure event thereby but the contract volumes specified in **Exhibit D** of this Agreement shall be ratably reduced for the period during which such condition of force majeure may exist. IN NO EVENT SHALL CONOCOPHILLIPS BE LIABLE FOR LOSS OF PROFITS OR SPECIAL OR CONSEQUENTIAL DAMAGES BECAUSE OF DELAY OR FAILURE TO MAKE DELIVERIES

### 31.   REVIEW OF AGREEMENT

RESELLER acknowledges that RESELLER has received a copy of this Agreement and all of its exhibits and addendums which were given to RESELLER at least ten (10) business days prior to the date RESELLER signed this Agreement.

32.    **SECTION TITLES**

The section titles contained in this Agreement are for convenience only and shall be without substantive meaning or content of any kind whatsoever.

33.    **WAIVER**

Waiver by CONOCOPHILLIPS or RESELLER of a default or breach of any provision, obligation, term or condition under this Agreement shall not be construed as a continuing waiver, or as a waiver of default or breach of any other provision, obligation, term or condition or of any subsequent default or breach of the same provision, obligation, term or condition.

34.    **WARRANTY AND REPRESENTATION**

(a)    RESELLER ACKNOWLEDGES THAT RESELLER HAS ENTERED INTO THIS AGREEMENT AFTER MAKING AN INDEPENDENT INVESTIGATION OF THE STATION SYSTEM AND OPERATIONS AND NOT UPON ANY REPRESENTATION AS TO PROFITS OR EARNINGS WHICH RESELLER IN PARTICULAR MIGHT BE EXPECTED TO REALIZE, NOR HAS ANYONE MADE ANY OTHER REPRESENTATION WHICH IS NOT EXPRESSLY SET FORTH HEREIN TO INDUCE RESELLER TO ACCEPT THE FRANCHISE GRANTED HEREIN AND EXECUTE THIS AGREEMENT.

(b)    CONOCOPHILLIPS WARRANTS THE TITLE TO ALL PRODUCTS SOLD HEREUNDER AND THAT SUCH PRODUCTS MET THE DESCRIPTION HEREIN.  NO OTHER WARRANTIES EXPRESSED OR IMPLIED ARE MADE BY CONOCOPHILLIPS, INCLUDING, BUT NOT LIMITED TO, FITNESS FOR A PARTICULAR PURPOSE; SUCH WARRANTIES ARE EXPRESSLY EXCLUDED FROM THIS AGREEMENT.

35.    **CONFIDENTIALITY**

RESELLER acknowledges that the systems, methods, procedures and information provided by CONOCOPHILLIPS to its resellers are the confidential and valuable property of CONOCOPHILLIPS, and therefore, RESELLER shall keep such information in a secure place and shall use such information in a confidential manner and shall not disclose it to third parties or use it, or allow others to use it, other than for the purposes of and as authorized by this Agreement. RESELLER shall only disclose such information to RESELLER's employees, accountants, attorneys and business counselors on a "need to know" basis, such information for the purposes of fulfilling their job responsibilities, and only if they undertake to keep such information confidential.  RESELLER shall ensure that individuals disclosed confidential information are informed of and requested to observe RESELLER's confidentiality obligation under this Agreement.    RESELLER's obligations under this Section shall survive termination or non-renewal of this Agreement.

36.    **SEVERABILITY**

Should any of the provisions contained in this Agreement be now, or hereafter become, illegal or unenforceable by State or Federal laws or otherwise, such  provisions shall be void during the period of conflict, and the remaining provisions shall continue to be of full force and effect.  If subsequent to the Contract Date of this Agreement valid State or Federal laws or regulations governing the relationship between RESELLER and CONOCOPHILLIPS take effect, this Agreement shall be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provisions of this Agreement in conflict therewith shall during such period be void.

37.    **SECURITY INTEREST**

(a)    To secure payment of all RESELLER's present and future indebtedness owed by RESELLER to CONOCOPHILLIPS at any time during the Term of this Agreement or upon its termination or expiration, RESELLER hereby grants to CONOCOPHILLIPS a security interest and/or a purchase money security interest in:

(1)    All of RESELLER's inventory of petroleum products and other products purchased from CONOCOPHILLIPS, regardless of when purchased;

(2)    All chattel paper, general intangibles and accounts receivable owing to RESELLER regardless of when or how incurred;

(3)     All of RESELLER's equipment purchased from CONOCOPHILLIPS or its predecessor in interest, regardless of when purchased; and

(4)     All proceeds of RESELLER's inventory, accounts receivable and equipment. RESELLER agrees to sign all financing statements and renewals as necessary to provide public record of this security interest.

(b)     In the event of insolvency of RESELLER, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against RESELLER, or failure of RESELLER to perform any of the obligations of payment in accordance with the terms of payment established by CONOCOPHILLIPS from time to time, CONOCOPHILLIPS shall have the option without notice or demand upon RESELLER to declare an event of default under the Uniform Commercial Code, and upon any such default, CONOCOPHILLIPS may declare all of RESELLER's indebtedness to CONOCOPHILLIPS immediately due and payable. Thereafter CONOCOPHILLIPS may proceed to enforce payment and may exercise any and all rights available to it. In addition, CONOCOPHILLIPS reserves the right to require a security deposit, letter of credit, and/or personal guaranty in accordance with CONOCOPHILLIPS' RESELLER security policy in effect from time to time.

## 38.     LEGAL FEES

(a)     If either party to this Agreement retains counsel and/or institutes a mediation, arbitration proceeding, or lawsuit for violation of or to enforce any of the covenants, obligations and/or conditions of this Agreement, or if either party initiates a mediation, arbitration proceeding, or lawsuit against the other for a declaration of rights under this Agreement, or if either party intervenes in a lawsuit in which the other is a party, to enforce or protect its interests or rights hereunder, the prevailing party shall be entitled to reimbursement of all of its costs, expenses and reasonable attorney fees incurred in connection therewith from the other party.

(b)     RESELLER agrees to pay all attorney fees, costs of suit and reasonable expenses incurred by CONOCOPHILLIPS in connection with the collection of any indebtedness owed, enforcement of indemnity protections or any liability of RESELLER to CONOCOPHILLIPS.

## 39.     MODIFICATION AND ASSIGNMENT

No amendment or other modification of this Agreement shall be valid or binding on either party hereto unless in writing and executed by both parties. As provided elsewhere herein, RESELLER shall not assign this Agreement, or any part thereof or interest therein, without the prior written consent of CONOCOPHILLIPS, which consent shall not be unreasonably withheld or delayed. Any unauthorized assignment shall be dismissed by CONOCOPHILLIPS as invalid and void. CONOCOPHILLIPS may assign all of its right, title, and interest in this Agreement, and the franchise relationship created by this Agreement, without RESELLER'S prior written consent.

## 40.     CHOICE OF LAW AND VENUE

This Agreement shall be governed, construed and interpreted under and in accordance with the laws of the State where the Station is located. Each party hereby expressly consents to exclusive jurisdiction of the courts of the State where the Station is located and of any Federal court located in the State where the station is located in connection with any action or proceeding arising out of or relating to this Agreement.

## 41.     CONTRACTING ENTITY

(a)     The individual, partnership and/or corporation first set forth above as RESELLER is the only entity that CONOCOPHILLIPS recognizes as the party contracting hereunder as RESELLER. Any name RESELLER uses as a "d.b.a." or fictitious firm name shall not be recognized by CONOCOPHILLIPS as the RESELLER.

(b)     RESELLER agrees that all Business Documents (as defined below) required under this Agreement or in conjunction with the operation of the Station shall be identical to the identity of RESELLER in this Agreement. RESELLER understands and acknowledges that Business Documents include, but are not limited to, business licenses, permits, business checking accounts, security agreements, financing statements, insurance polices, proofs of insurance, and utilities ("Business Documents").

(c)     If CONOCOPHILLIPS becomes aware of Business Documents containing names other than RESELLER's name as set forth in this Agreement, upon written notice from CONOCOPHILLIPS, RESELLER

agrees that RESELLER shall promptly, at RESELLER's expense, correct the name on the Business Document(s) to be identical to the name of RESELLER as set forth herein. RESELLER understands that any other party, other than the named RESELLER, asserting that they are a party hereof will be dismissed as invalid and shall not be recognized in any manner as a party to this Agreement.

(d)    If RESELLER consists of more than one (1) person, each person's liability under this Agreement shall be joint and several.

(e)    If RESELLER is a corporation, RESELLER represents and warrants the person executing this Agreement is an officer of said corporation, is duly authorized to execute and deliver all documents or provide any instruments on behalf of said corporation and that his or her execution of this Agreement or any ancillary agreements or documents related to this Agreement are and shall be binding on said corporation.

## 42.    NO THIRD PARTY BENEFICIARY

This Agreement is personal to RESELLER and is intended for the sole use and benefit of RESELLER and ConocoPhillips. No other third party is a third party beneficiary under this Agreement.

## 43.    ELECTRONIC SIGNATURES

To the fullest extent permitted by applicable law, the parties hereby consent to the use of electronic signatures, including but not limited to facsimile signatures, to enter into this Agreement, including all Exhibits and any subsequent amendments, and to evidence the parties' intent to execute and enter into a binding agreement. The ConocoPhillips Marketing website ID assigned to RESELLER or its authorized personnel and the associated password shall constitute an electronic signature by such personnel on behalf of the RESELLER. Prior to execution of this Agreement, RESELLER shall verify to ConocoPhillips the officer or representative of RESELLER's organization who is authorized to execute this Agreement. The IDs and associated passwords are personal to individuals within RESELLER's organization and are each individual's responsibility to keep confidential. RESELLER shall take all necessary steps at all times to prevent any other person from having knowledge of, gaining access to, or using such IDs and passwords. The foregoing shall not preclude the parties from executing this Agreement, any of the Exhibits or any subsequent amendments to this Agreement in hardcopy form.

## 44.    ETHICS CONFLICT OF INTEREST

Conflicts of interest relating to this Agreement are strictly prohibited. Except as otherwise expressly provided herein, neither party to this Agreement, nor any employee or officer of either party, shall, directly or indirectly, pay salaries, commissions or fees to employees or officers of the other party, or designees of such employees or officers, or make to or receive from any employee or officer of the other, or designee of such employee or officer, any payments or rebates, or favor employees or officers of the other party, or designees of such employees or officers, with gifts or entertainment of significant cost or value, or with services or goods sold at less than full market value, or enter into business arrangements with employees or officers of the other party, unless such employees or officers are acting as representatives of that other party.

## 45.    BINDING EFFECT

This Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, and permitted successors and assigns of the respective parties hereto.

## 46.    EXHIBITS

**Exhibits A, B, C, D, E, F, and G** referenced herein, are hereby incorporated herein and made a part hereof by this Agreement.

## 47.    ENTIRE AGREEMENT

(a)    This Agreement cancels and supersedes, as of the Contract Date hereof, all prior written and or oral, expressed or implied, agreements between CONOCOPHILLIPS and RESELLER in regards to the following:

(1)    RESELLER's and CONOCOPHILLIPS' rights, duties and obligations in respect of RESELLER's operation of the Station;

(2)     The sale and delivery of Branded ConocoPhillips Products at the Station and all the terms and conditions as to CONOCOPHILLIPS' sale to RESELLER and RESELLER's purchase from CONOCOPHILLIPS, of Branded ConocoPhillips Products for sale at the Station; and

(3)     Any and all of the relationship which exists between CONOCOPHILLIPS and RESELLER.

(b)     Neither CONOCOPHILLIPS nor RESELLER is obligated by any inducement, statement, representation, promise or agreement made by either of them that is not included in this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Contract Date first set forth above.

ACCEPTED AND AGREED TO                          ACCEPTED AND AGREED TO

THIS 30 DAY OF _Juny_, 2009.                    THIS 70 DAY OF _July_, 2009.

CONOCOPHILLIPS COMPANY:                          RESELLER: TMB Enterprises Inc

By:_____                       By:_____
    Ross Davidson                                    Thomas P. Helo
    Manager, West Coast                              President

**EXHIBIT A**

**# RS/855076**

**STATION LOCATION**

TMB Enterprises Inc
12904 Roscoe Blvd.
Sun Valley, CA 91352

## EXHIBIT B

## CONOCOPHILLIPS BRAND(S) LICENSED UNDER THIS AGREEMENT:

**76®**

**EXHIBIT C**

**DELIVERY CHANGE**

During the term of the Agreement, there is a possibility that CONOCOPHILLIPS will cease delivering Branded ConocoPhillips Products and RESELLER will become responsible for arranging and managing all aspects of delivery of products.   RESELLER hereby acknowledges CONOCOPHILLIPS's disclosure.   RESELLER and CONOCOPHILLIPS agree that in the case of such decision, the delivery, risk of loss, pricing and any other terms of the   Agreement will be modified in light of the new method of  delivery of  ConocoPhillips Branded Products. CONOCOPHILLIPS agrees to provide RESELLER one hundred eighty (180) days notice before stopping delivery of Branded ConocoPhillips Products.  The Parties agree to execute an amendment to the Agreement, within 90 days after CONOCOPHILLIPS' notice of delivery change to address contract terms including, but not limited to, ARP, Delivery, Title to Motor Fuel and Stock Losses, and Terms of Payment.

**EXHIBIT D**

**# RS/855076**

**QUARTERLY/ANNUAL MINIMUM VOLUME SCHEDULE**

**AS OF DATE: August 3, 2009**

**Gasoline:**

|  | 1st Qtr Jan-Mar | 2nd Qtr Apr-Jun | 3rd Qtr Jul-Sep | 4th Qtr Oct-Dec | Annual Jan-Dec |
|---|---|---|---|---|---|
| Fuel Volume | 525,000 | 525,000 | 525,000 | 525,000 | 2,100,000 |
| Total | 525,000 | 525,000 | 525,000 | 525,000 | 2,100,000 |



**EXHIBIT E**

**BRANDED TEMPERATURE ADJUSTMENT AGREEMENT**

Dear Reseller:

You have elected to purchase various motor fuels from CONOCOPHILLIPS for the above subject service station, pursuant to a CONOCOPHILLIPS BRANDED RESELLER AGREEMENT ("Agreement").

By this Agreement you acknowledge that CONOCOPHILLIPS has advised you that single deliveries made to your service station may be on a 60 degrees Fahrenheit temperature corrected basis, unless you elect to accept delivery on a gross gallonage basis.

You understand and agree that the election made herein shall be effective for a period of one (1) year from the date of this letter and then on a year to year basis thereafter unless canceled by written notice given thirty (30) calendar days prior to the expiration of any one (1) year period.

You hereby elect to accept single deliveries on the following basis (choose one):

____X____ Temperature Corrected

_____ Gross Gallonage

ACCEPTED AND AGREED TO

THIS 3̲0̲ DAY OF J̲u̲n̲y̲, 200̲9̲.

CONOCOPHILLIPS COMPANY:

By_____
    Ross Davidson
    Manager, West Coast

ACCEPTED AND AGREED TO

THIS 7̲0̲ DAY OF J̲u̲l̲y̲, 200̲9̲.

RESELLER: TMB Enterprises Inc

By_____
    Thomas P. Helo
    President


*Verified*

**EXHIBIT F**
**FACILITY ALLOWANCE AGREEMENT**

TMB Enterprises Inc
12904 Roscoe Blvd.
Sun Valley, CA  91352

Station #  RS/855076
Sold To # 10092601
Effective Date August 3, 2009
Expiration Date  August 31, 2019

**BRANDED FACILITY ALLOWANCE AGREEMENT**

Dear Reseller:

In order to meet competition or offers that have previously been made to you by one or more of our competitors, we agree to give you the following facility allowance, relating to that certain Station, referenced above, for each gallon of Branded ConocoPhillips Products purchased by your Station, pursuant to our Branded Reseller Agreement with the above referenced Effective Date.  Capitalized terms used in this Exhibit, but not defined here, shall have the meaning given to them in the Branded Reseller Agreement.

**PRODUCTS:**  Branded ConocoPhillips Gasoline

| Volume Range (Gallons Purchased) | Facility Allowance ($pg) |
|---|---|
| 0 to 100,000 | ■ |
| 100,001 to 150,000 | ■ |
| 150,001 and above | ■ |

This allowance will be paid in arrears based on the Station's previous month's actual volume of Branded ConocoPhillips Products sold.  The allowance will be in effect for five (5) years from the Effective Date.  After the fifth (5th) year, CONOCOPHILLIPS may decrease or withdraw the facility allowance at any time, upon no less than ninety (90) days prior written notice to you.

We further agree that if CONOCOPHILLIPS exercises its right to decrease or withdraw the facility allowance, you may terminate your Branded Reseller Agreement as of the effective date of the proposed change or withdrawal by giving CONOCOPHILLIPS written notice not less than ten (10) days before the effective date of the change or withdrawal.

This Agreement is incorporated by reference to the Branded Reseller Agreement.  Please sign, date and return the copy of this letter indicating your acceptance of these terms.

ACCEPTED AND AGREED TO
THIS 30 DAY OF July , 2009.

CONOCOPHILLIPS COMPANY:

By:_____
Ross Davidson
Manager, West Coast

ACCEPTED AND AGREED TO
THIS 20 DAY OF July , 2009.

RESELLER: TMB Enterprises Inc

By:_____
Thomas P. Melo
President

EXHIBIT G

## GASOLINE AND DISTILLATE COMPLIANCE AGREEMENT

This Exhibit G, the Gasoline and Distillate Compliance Agreement, effective **August 3, 2009**, to be attached to and become a part of the Branded Reseller Agreement between ConocoPhillips Company (hereinafter referred "ConocoPhillips") and **TMB Enterprises Inc**, whose principal place of business is at **12904 Roscoe Blvd., Sun Valley, CA 91352** (hereinafter referred to as "RESELLER"), relates to the delivery to RESELLER; the receipt, storage, handling, and distribution by RESELLER; and the sale or offering for sale at the Station of the ConocoPhillips Brand(s) of Gasoline and Distillate subject to environmental regulations as set forth herein.

**Purpose.** This agreement establishes the respective rights and obligations of ConocoPhillips and RESELLER regarding programs of compliance with regulations of the United States Environmental Protection Agency ("EPA"), the Federal Trade Commission ("FTC"), and related state agencies promulgated pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq., or similar state law, including the federal regulations detailing compliance with fuels requirements found in 40 CFR Parts 79 and 80, as amended, rules relating to octane certification and notification found at 16 CFR 306, and similar state regulations (the "Regulations"). It is the intent of the parties to fully comply with the Regulations. It shall be the RESELLER's sole responsibility to comply with the Regulations applicable to product handling, transportation, documentation, storage or retail outlet operations that are not specifically assigned to ConocoPhillips herein. "The Station" as used herein shall mean a retail outlet as to which RESELLER is the retailer, which is supplied Gasoline and/or Distillate under the ConocoPhillips brand and which is required or authorized by the Regulations to offer for sale Gasoline and/or Distillate subject to the Regulations.

1.    **UNLEADED GASOLINE**

    A)    ConocoPhillips' Obligations. ConocoPhillips shall:

        i.    Make available to RESELLER, pursuant to other applicable contract(s), the ConocoPhillips brand of unleaded Gasoline to enable RESELLER to have available for sale at the Station an unleaded Gasoline as required by the Regulations. This shall include making available appropriate Gasoline for a geographic area(s) of the Station wherein distinct RVP, oxygenate, or other Regulations apply.

        ii.    Make available to RESELLER for the Station's pump dispenser identifications of the ConocoPhillips brand of unleaded Gasoline and the notices and labels required by all applicable Regulations.

        iii.    If required by the Regulations, ConocoPhillips shall make available unleaded Gasoline suitable for oxygenate blending, and make reasonable efforts to secure a source of oxygenate to enable RESELLER to have available for sale at the Station unleaded Gasoline meeting the applicable oxygenate content specified by the Regulations.

        iv.    Supply to RESELLER for the Station any documentation required to accompany shipments of the ConocoPhillips brand of unleaded Gasoline.

    B)    **RESELLER Obligations.** With respect to RESELLER's receipt, transportation, storage, handling, and distribution, and the Station's receipt, storage, handling, and sale of unleaded Gasoline, RESELLER shall comply with the following procedures, as applicable:

        i.    RESELLER shall dedicate exclusively for unleaded Gasoline all tanks utilized for storage of unleaded Gasoline, all receiving lines and pumps to unleaded Gasoline storage, and, if applicable, all loading lines and pumps from unleaded Gasoline storage to load rack.

        ii.    If applicable, trucks provided by RESELLER for delivery of unleaded Gasoline to RESELLER's plant storage or the Stations must have all compartments and associated piping to be used for such product thoroughly drained before loading.

        iii.    RESELLER shall properly affix and maintain the pump dispenser identifications and the notices and labels required by the Regulations as made available by ConocoPhillips.

iv.    RESELLER shall paint or have painted the manhole covers and fill-lines caps to identify storage tank(s) dedicated to unleaded Gasoline.

v.     RESELLER shall equip and maintain the Gasoline pump dispensers with nozzles in compliance with the Regulations.

vi.    RESELLER shall ensure that the ConocoPhillips brand of Gasoline meeting the applicable content requirements of the Regulations for the geographical area(s) of the Stations is obtained and delivered to RESELLER's plant storage and the Station in sufficient time and in sufficient quantity to allow such facilities to dispense Gasoline meeting the applicable content requirements during the time period specified by the Regulations.

vii.   RESELLER shall provide assurances to ConocoPhillips that unleaded Gasoline will be handled and sold in a manner meeting Regulations and consistent with time, place and other restrictions identified on the product's transfer documents, and will establish and enforce a positive program of compliance to assure that the RESELLER's employees or agents, or third parties will not cause, allow, or permit contamination of the unleaded Gasoline or introduction of gasoline not meeting the applicable content requirements of the Regulations into vehicles at the Station.

viii.  RESELLER shall grant permission to ConocoPhillips to review and/or inspect each Station's compliance with the Regulations.

ix.    RESELLER shall assure that the ConocoPhillips brand of Gasoline meeting the applicable Regulations for the geographical area(s) of RESELLER's Station is not commingled with Gasoline such that the resultant mixture at RESELLER's plant storage, if applicable, and the Station fails to meet the applicable Regulations during the time period specified by the Regulations.

x.     RESELLER shall give prompt notice and details to ConocoPhillips of any circumstance or occurrence which reasonably could cause the unleaded Gasoline or the unleaded Gasoline dispensing equipment to be not in compliance with the Regulations, promptly take measures to bring the unleaded Gasoline or the unleaded Gasoline dispensing equipment into compliance, and notify ConocoPhillips of the measures taken.

xi.    RESELLER shall retain records of product transfer documentation consistent with the Regulations.

xii.   RESELLER shall maintain all product segregations as required by the Regulations.

xiii.  RESELLER shall not sell any grade of Gasoline treated with, contaminated with, or containing MMT, tetraethyl lead, tetramethyl lead or other mixed lead alkyls.

xiv.   RESELLER will cease distribution of product found or known to be in non-compliance with the Regulations and promptly remedy the non-complying product. RESELLER shall provide ConocoPhillips a copy of the report for actions taken with date and time potential non-compliant product sales were suspended.

xv.    RESELLER shall, subsequent to any report of suspected non-compliance, provide documents to ConocoPhillips for the prior five deliveries of gasoline fuel to the storage tank at issue: a) source of supply, b) the Station tank inventory volume prior to delivery, c) date and volume of delivery, d) product transfer documentation, e) test results or other evidence of supply quality, and f) carrier procedures used to avoid contamination.

xvi.   RESELLER shall provide or obtain access for sampling by ConocoPhillips and other authorized persons to review and/or inspect RESELLER's and each the Station's compliance with the Regulations.

xvii.  RESELLER shall promptly notify ConocoPhillips of any sampling done or inquiries made by representatives of governmental agencies regarding the Regulations.

xviii.   RESELLER shall not add or blend any substances to Gasoline except as allowed by the Regulations.

2.   **HIGHWAY DIESEL FUEL**

A)   ConocoPhillips' Obligations.  ConocoPhillips shall:

i.   Make available to RESELLER, pursuant to other applicable contract(s), the ConocoPhillips brand of highway diesel fuel ("Distillate") to enable RESELLER to have available for sale at the Stations Distillate meeting the applicable specifications required by the Regulations.

ii.   Supply to RESELLER for the Station any documentation required to accompany shipments of said ConocoPhillips brand of Distillate.

B)   **RESELLER Obligations.** With respect to RESELLER's receipt, transportation, storage, handling and distribution, and the Stations' receipt, storage, handling, and sale of Distillate, RESELLER shall comply with the following procedures:

i.   RESELLER shall ensure that the ConocoPhillips brand of Distillate meeting the applicable specifications required by the Regulations is obtained and delivered to RESELLER's plant storage and the Stations in sufficient time to allow such facilities to dispense said Distillate meeting the applicable specifications.

ii.   RESELLER shall dedicate exclusively for Distillate all tanks utilized for storage of Distillate, all receiving lines and pumps to Distillate storage, and all loading lines and pumps from Distillate storage to load rack.

iii.   Trucks provided by RESELLER for delivery of Distillate to RESELLER's plant storage or the Stations must have all compartments and associated piping to be used for such product thoroughly drained before loading.

iv.   RESELLER shall properly affix and maintain the pump dispenser identifications and the notices and labels required by the Regulations as made available by ConocoPhillips.

v.   RESELLER shall paint or have painted the manhole covers and fill-lines caps to identify storage tank(s) dedicated to Distillate.

vi.   RESELLER shall assure that each the Station has in inventory Distillate which complies with the Regulations.

vii.   RESELLER shall establish and enforce a positive program of compliance to assure that the RESELLER Supplied Dealer, its employees or agents, or third parties will not cause, allow, or permit the introduction of diesel fuel not meeting the specifications required by the Regulations into highway vehicles at the Station.

viii.   RESELLER shall provide assurances to ConocoPhillips that Distillate will be handled and sold in a manner meeting Regulations and consistent with time, place and other restrictions identified on the product's transfer documentation.

ix.   RESELLER shall retain records of product transfer documentation consistent with the Regulations.

x.   RESELLER shall maintain all product segregations as required by the Regulations.

xi.   RESELLER shall cease distribution within 24 hours of notification of product found or known to be in non-compliance with the Regulations and promptly remedy the non-complying product. RESELLER shall provide ConocoPhillips a copy of the report for actions taken with date and time potential non-compliant product sales were suspended.

xii.    RESELLER shall give prompt notice and details to ConocoPhillips of any circumstances or occurrence which reasonably could cause the Distillate to be not in compliance with the Regulations, promptly take measures to bring said Distillate into compliance, and notify ConocoPhillips of the measures taken.

xiii.   RESELLER shall, subsequent to any report of suspected non-compliance, provide documents to ConocoPhillips for the prior five deliveries of diesel fuel to the storage tank at issue:  a) source of supply, b) site tank inventory volume prior to delivery, c) date and volume of delivery, d) product transfer documentation, e) test results or other evidence of supply quality, and f) carrier procedures used to avoid contamination.

xiv.    RESELLER shall promptly notify ConocoPhillips of any sampling done or inquiries made by representatives of governmental agencies regarding the Regulations.

xv.     RESELLER shall provide or obtain access for sampling by ConocoPhillips and other authorized persons to review and/or inspect RESELLER's and each the Station's compliance with the Regulations.

xvi.    RESELLER shall not add or blend any substances to Distillate except as allowed by the Regulations.

This Exhibit G shall be effective on the date above written.

**CONOCOPHILLIPS COMPANY**

Signature: _____

Name Printed: _____

Title: _____

**RESELLER**

Signature: _____

Name Printed: _____Thomas P. Hclo____

Title: _____President_____



855076
TMB Enterprises Inc ("Reseller")
12904 Roscoe Blvd.
Sun Valley, CA  91352 ("Station")

## ADDENDUM TO CONOCOPHILLIPS BRANDED RESELLER AGREEMENT
## BRAND IMAGE AND EQUIPMENT INSTALLATION AND EXPENSES

THIS ADDENDUM TO CONOCOPHILLIPS BRANDED RESELLER AGREEMENT is dated as of June 2, 2009, between **TMB Enterprises Inc** ("RESELLER"), and CONOCOPHILLIPS COMPANY ("CONOCOPHILLIPS"), a Delaware Corporation (hereinafter each shall be referred in the singular as a "Party" and collectively as "the Parties");

### W I T N E S S E T H

**WHEREAS,** RESELLER and CONOCOPHILLIPS have entered into a ConocoPhillips Branded Reseller Agreement effective as of **August 3, 2009** ("Agreement") for the purchase from CONOCOPHILLIPS of 76 branded motor fuels and other related products for resale at Station(s) listed in the Agreement; and

**WHEREAS,** the Parties desire to enter into this ADDENDUM TO CONOCOPHILLIPS BRANDED RESELLER AGREEMENT, Brand Image and Equipment Installation and Expenses ("Installation Addendum") which the Parties intend shall modify, amend, and be appended to the Agreement;

**NOW,** therefore, in consideration of the premises and the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency thereof are hereby acknowledged by the Parties, the Parties hereto agree as follows:

1.      CONOCOPHILLIPS shall, at its sole cost and expense construct and install CONOCOPHILLIPS' specified current Image Requirements and other items outlined in Exhibit A, hereto referred to as Brand Requirements, so as to cause RESELLER's Station(s) to be operational under the CONOCOPHILLIPS 76 brand and comply with the current Image Requirements published on CONOCOPHILLIPS' website or otherwise prescribed by CONOCOPHILLIPS from time to time.  CONOCOPHILLIPS and RESELLER agree the total cost of the Brand Requirements is, at the time this Installation Addendum is executed, estimated to be **$75,000.00**.  For the purposes set forth in Section 3 hereof, RESELLER'S obligations to reimburse CONOCOPHILLIPS the costs for the Brand Requirements the foregoing estimated amount shall be replaced by CONOCOPHILLIPS actual out of pocket costs and expenses following the completion of the installation of said Brand Requirements.  Said costs will be set forth in Exhibit B.

2.      RESELLER acknowledges and agrees to:

(a)      Obtain approval of the installation of Brand Requirements from RESELLER's landlords (if any), municipalities, and such other persons or entities from whom approvals for installation may be required.  All entitlement and permitting conditions must be reviewed and approved by CONOCOPHILLIPS' Marketing representative prior to final approval by the local approving authority.

(b)      Permit CONOCOPHILLIPS' employees, authorized vendors and service providers reasonable and timely access to the Station(s) premises for the installation of the Brand Requirements and change or remove any or all of the current Image Requirements in the event CONOCOPHILLIPS modifies the current Image Requirements from time to time.

3.      In the event RESELLER ceases to handle, store and offer for resale CONOCOPHILLIPS branded motor fuels at any of the Stations, or in the event RESELLER commences offering from any of the



Stations any motor fuels produced by other motor fuel producers without CONOCOPHILLIPS' express written permission, CONOCOPHILLIPS will immediately discontinue to supply RESELLER· and RESELLER shall permit CONOCOPHILLIPS, its employees, contractors and vendors timely access to the Station(s) to remove any and all of the Brand Requirements installed by CONOCOPHILLIPS at the Stations, at RESELLER'S expense.   In addition, RESELLER agrees to and shall reimburse CONOCOPHILLIPS the full amount of the costs and expenses incurred by CONOCOPHILLIPS for the initial installation of the Brand Requirements (and any upgrades or replacements to said requirements), less one sixtieth (1/60th) of those costs and expenses for each full month after the date of the initial installation of the Brand Requirements the Station(s) resell CONOCOPHILLIPS branded fuel until the date RESELLER ceases to resell CONOCOPHILLIPS branded motor fuels from the Station(s).

4.       CONOCOPHILLIPS shall have the right at any and all times to enter upon the Stations to inspect any or all of said current Image Requirements to:

(a)      Determine if the obligations of RESELLER are being fulfilled under this Installation Addendum;

(b)      Maintain and/or repair any or all of the current Image Requirements, at RESELLER'S expense, in the event RESELLER fails to maintain the current Image Requirements as required.

5.       RESELLER agrees to keep all of said current Image Requirements depicting the CONOCOPHILLIPS Trademarks free and clear of all other signs and RESELLER shall not install any other signs at the Stations in a position that will obstruct the visibility of the CONOCOPHILLIPS trademark materials installed at the Station to street or highway traffic or divert motorists' attention from said signs.

6.       RESELLER agrees to keep clean all of the current Image Requirements signs, and further agrees to promptly replace, at RESELLER'S expense, all burned out or defective lamps illuminating said signs.

7.       RESELLER agrees to operate all illuminated signs with the electricity on from sunset to closing time of each day, or from dusk until dawn if the Stations are operated twenty-four (24) hours per day and RESELLER is to pay all expenses for the operation thereof.

8.       RESELLER agrees not to remove or alter, except as otherwise required to maintain, any of the current Image Requirements installed at the Station and RESELLER agrees to give CONOCOPHILLIPS at least thirty (30) days prior written notice of any desired alteration or removal thereof.

This Agreement cancels and/or supersedes all prior and current Paint and Sign Amendments between the parties.

IN WITNESS WHEREOF, the parties hereto have executed this Installation Addendum as of the day and year first referenced above.

ACCEPTED AND AGREED TO                    ACCEPTED AND AGREED TO

THIS 30 DAY OF ___Juuy___, 2004.        THIS 20 DAY OF ___July___, 2004.

CONOCOPHILLIPS COMPANY:                  RESELLER: TMB Enterprises Inc

By_____              By_____      Verified
Ross Davidson                            Thomas P. Helo
Manager, West Coast                      President

revised 76sigrsl.doc 2/15/99                          2



**Exhibit A:**
**Brand Requirements**

1.    ConocoPhillips Image Requirements (itemize)

2.

3.

4.

5.

6.



**Exhibit B:**
**Actual out of pocket costs and expenses:**

**Total to be Amortized:**

$

# EXHIBIT B

**PERSONAL GUARANTY**
ACKNOWLEDGED

TO:    CONOCOPHILLIPS COMPANY, ITS SUCCESSORS AND ASSIGNS,
       AND ANY OF ITS SUBSIDIARIES OR AFFILIATES (hereinafter called "ConocoPhillips Company")

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and to induce ConocoPhillips Company to extend credit to or do business with Purchaser, or to guarantee loans where applicable to Purchaser, the undersigned (hereinafter called "Guarantor") hereby guarantees unconditionally the full and prompt payment of all present and future indebtedness of T.M.B. Enterprises, Inc.  whose address is 12904 Roscoe Blvd Sun Valley, CA 91352 herein called "Purchaser" to ConocoPhillips Company, including without limitation that indebtedness arising from (1) ConocoPhillips Company sales of petroleum products or other merchandise to Purchaser, (2) any loans to Purchaser , whether one or more, now or hereafter existing, or (3) any and all other loans, indebtedness, liabilities, obligations and duties of every kind and character, whether now or hereafter existing or arising, whereby Purchaser becomes indebted to ConocoPhillips Company, regardless of the amount or balance thereof, together with any and all renewals, extensions, or modifications of such indebtedness, liabilities, obligations, and duties, or any part thereof.  GUARANTOR'S OBLIGATION UNDER THIS GUARANTY IS A GUARANTY OF PAYMENT AND NOT OF COLLECTION.  SHOULD ANY PRESENT OR FUTURE INDEBTEDNESS INCURRED BY PURCHASER NOT BE PAID WHEN DUE, CONOCOPHILLIPS COMPANY MAY PROCEED AGAINST GUARANTOR FOR SUCH INDEBTEDNESS AT ANY TIME, WITHOUT NOTICE AND WITHOUT ANY PROCEEDING OR ACTION AGAINST PURCHASER, AND GUARANTOR HEREBY WAIVES ANY DEMAND FOR PAYMENT.

Guarantor hereby waives notice of acceptance of this Guaranty, notice of the products or merchandise sold by ConocoPhillips Company to Purchaser, notice of the execution and delivery, amendment, extension or renewal of any present or future agreement, loan, or any other instrument pertaining to indebtedness, and notice of default by Purchaser.

Guarantor consents, without further notice, to Purchaser and ConocoPhillips Company entering into new agreements from time to time, replacing the previous agreements , as well as modifying from time to time the volumes or types of petroleum products to be purchased, as shown in such agreements.  Additionally, Guarantor consents, without further notice, to ConocoPhillips Company increasing or decreasing Purchaser's line of credit when necessary.  Guarantor further consents, without further notice, to any extension or extensions of the time or times of payment of said indebtedness, or any portion thereof, and to any change in form or amount, or renewal at any time, of such indebtedness, or any portion thereof, or of any evidence thereof taken at any time by ConocoPhillips Company. Guarantor consents, without further notice, that he and/or she will be liable to ConocoPhillips Company for all indebtedness incurred by the aforesaid changes.

THIS IS TO BE A CONTINUING GUARANTY, and any such extension, or the acceptance of any sum or sums on account, or of any note or draft of Purchaser and/or any third party, or security, from Purchaser, shall not affect this Guaranty.

This Guaranty shall continue until Guarantor or the executors or administrators of Guarantor, in the case of the death of Guarantor, shall have given written notice by registered mail to ConocoPhillips Company at the following address:

        ConocoPhillips Company        315 S. Johnstone        Treasury Department        Bartlesville, OK 74004

to make no further advances on the security hereof.  This Guaranty shall not be automatically revoked by the death of Guarantor.  Revocation shall have no effect whatsoever on Guarantor's liability with respect to any indebtedness incurred by Purchaser prior to the effective date of the revocation.

This Guaranty shall not be affected by any change in the entity status or business structure of Purchaser, whether caused by death, by the admission of any new member or members, or by the withdrawal of any member or members, or by any change for any cause.  Furthermore, if Purchaser's assets or a major portion thereof are transferred to any other party or parties otherwise than by operation of law, and if ConocoPhillips Company shall sell any petroleum products or merchandise to such transferee or transferees, or enter into any other transaction whereby such transferee or transferees become indebted to ConocoPhillips Company, this Guaranty, subject to all the other terms hereof, shall apply to any indebtedness or balance of indebtedness of such other transferee or transferees to ConocoPhillips Company.

Should Purchaser become bankrupt or insolvent, then ConocoPhillips Company (simultaneously with proceeding against Guarantor, or otherwise), without demand or notice, may prove and file its entire claim in any court of competent jurisdiction and collect any dividends that may be realized on said entire claim, and in case of said collection ConocoPhillips Company, without any notice or demand, may proceed against Guarantor at any time for the difference between the amount of said entire claim due ConocoPhillips Company from Purchaser, and the amount of such dividend or dividends thereon.

Should ConocoPhillips Company decide it is necessary to recover from Guarantor through collection activities, Guarantor shall (to the fullest extent permitted by law) be liable to ConocoPhillips Company for the costs of such collection and/or attorney fees.

Guarantor hereby waives the benefit of all homestead and other exemption laws, provided such waiver can lawfully be made.

THIS GUARANTY SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THAT STATE'S CHOICE OF LAW PRINCIPLES.

This Guaranty shall inure to and be binding upon the parties, their representatives, successors and assigns.

WITNESS the signature of Guarantor in City of _Northridge_ , County of _Los Angeles_ , State of _California_ , this _29_ day of _June_ , 20_09_.

GUARANTOR'S SIGNATURE: _____    NAME PRINTED: **Thomas Helo**

_10201 Mason Ave #14_    _Chatsworth_    _CA_    _91311_    _____
Home Address    Street    City/State    Zip Code    Guarantor's Social Security Number

GUARANTOR'S SIGNATURE: _____    NAME PRINTED: **Suzanne Helo (Spouse)**

_10201 MASON AVE #14 CHATSWORTH CA. 91311_    _____
Home Address    Street    City/State    Zip Code    Guarantor's Social Security Number

State of _California_
County of _Los Angeles_

Before me, the undersigned Notary Public, personally appeared _Thomas Helo, Suzanne Helo_ , known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing Guaranty and who acknowledged that he/she executed such Guaranty for the purposes and consideration expressed therein.  In witness whereof I have set my hand and official seal of office on _6/29/09_ .

_Oct 27, 2011_    _____
Commission Expires    Notary Public

bmdpers

MARCO J. CRUZ
Commission # 1776448
Notary Public - California
Los Angeles County
My Comm. Expires Oct 27, 2011

# EXHIBIT C

BEIRNE, MAYNARD & PARSONS, L.L.P.

1300 POST OAK BOULEVARD

SUITE 2500

HOUSTON, TEXAS 77056-3000

BRIAN E. WATERS

(713) 623-0887

FAX (713) 960-1527

DIRECT DIAL (713) 960-7334
EMAIL: BWATERS@BMPLLP.COM

May 29, 2014

TMB Enterprises, Inc.
c/o Thomas Helo
9250 Reseda Blvd, Suite 238
Northridge, CA 91324

*Via CM-RRR and*
*Regular U.S. Mail*

Re:    Outstanding Amounts Owed To Phillips 66 Company

Dear Mr. Helo:

My firm represents Phillips 66 Company ("Phillips 66") in regard to the collection of all amounts TMB Enterprises, Inc. ("TMB Enterprises") owes in connection with the Branded Reseller Agreement dated August 3, 2009 between ConocoPhillips Company ("ConocoPhillips") and TMB Enterprises (the "Agreement").    As you know, ConocoPhillips has assigned the Agreement to Phillips 66.

From previous correspondence with Phillips 66, you know that TMB Enterprises is in breach of the Agreement and has failed to pay $350,322.98.  The many attempts to resolve this matter with you have failed.  Consequently, Phillips 66 hereby makes a **FINAL** demand for payment of the amounts owed under the Agreement.  You are advised that if payment in full is not received in my office within fourteen (14) days from the date of this letter, or if you have not called me to make arrangements to satisfy the outstanding amounts owed by that date, I will advise Phillips 66 to file suit immediately to recover the principal amount owed plus pre- and post-judgment interest as allowed by law, and all attorneys' fees, costs and expenses incurred by Phillips 66 through trial of this matter.

If you have any questions, please call me immediately.  Otherwise I will proceed as outlined above.

Sincerely yours,

BEIRNE, MAYNARD & PARSONS, L.L.P.

Brian E. Waters

BEIRNE MAYNARD & PARSONS, L.L.P.

1991972v.1 IMANAGE 107110   AUSTIN · DALLAS · HOUSTON · NEW ORLEANS · SAN ANTONIO



Pitney Bowes

# ShipRequest™



| | |
|---|---|
| Ship To: | TMB Enterprises |
| Company: | c/o Thomas Helo |
| Address 1: | 9250 Reseda Blvd. |
| Address 2: | Suite 238 |
| Address 3: | |
| City: | North Ridge |
| State/Province: | California |
| ZIP/Postal Code: | 91324 |
| Country: | United States |
| email: | |
| Phone: | |
| Matter #: | 107113 |
| Case Name: | P66/TMB |
| Doc Name: | demand letter |
| Package Type: | Letter |
| Address Type: | Commercial |
| Deliver By: | Mon, June 2, 2014 |
| Atty Initials: | BEW |

RECEIVED
MAY 2 9 2014

---

Special Instructions:                       9171 9690 0593 9000 2157 09

---

| | |
|---|---|
| Sender Name: | Linda Kimball |
| email: | lkimball@bmpllp.com |
| Prepared By: | LMK |
| Phone: | |

 English ⌄    Customer Service    USPS Mobile

 USPS.COM

Quick Tools ⌄    Ship a Package ⌄    Send Mail ⌄    Manage Your Mail

# USPS Tracking™

Tracking Number: **9171969005939000215709**



## Product & Tracking Information

**Postal Product:**          **Features:**
First-Class Mail®            Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| May 29, 2014 | Electronic Shipping Info Received | |

The U.S. Postal Service was electronically notified by the shipper on May 29, 2014 to expect your package for mailing. This does not indicate receipt by the USPS or the actual mailing date. Delivery status information will be provided if/when available. No further information is available for this item.

## Track Another Package

**What's your tracking (or receipt) number?**

Track It

BEIRNE, MAYNARD & PARSONS, L.L.P.

1300 POST OAK BOULEVARD

SUITE 2500

HOUSTON, TEXAS 77056-3000

BRIAN E. WATERS

(713) 623-0887

FAX (713) 960-1527

DIRECT DIAL (713) 960-7334
EMAIL: BWATERS@BMPLLP.COM

May 29, 2014

TMB Enterprises, Inc.
c/o Thomas Helo
18957 Granada Circle
Porter Ranch, CA 91326

*Via CM-RRR and*
*Regular U.S. Mail*

Re:   Outstanding Amounts Owed To Phillips 66 Company

Dear Mr. Helo:

My firm represents Phillips 66 Company ("Phillips 66") in regard to the collection of all amounts TMB Enterprises, Inc. ("TMB Enterprises") owes in connection with the Branded Reseller Agreement dated August 3, 2009 between ConocoPhillips Company ("ConocoPhillips") and TMB Enterprises (the "Agreement").   As you know, ConocoPhillips has assigned the Agreement to Phillips 66.

From previous correspondence with Phillips 66, you know that TMB Enterprises is in breach of the Agreement and has failed to pay $350,322.98.  The many attempts to resolve this matter with you have failed.   Consequently, Phillips 66 hereby makes a **FINAL** demand for payment of the amounts owed under the Agreement.  You are advised that if payment in full is not received in my office within fourteen (14) days from the date of this letter, or if you have not called me to make arrangements to satisfy the outstanding amounts owed by that date, I will advise Phillips 66 to file suit immediately to recover the principal amount owed plus pre- and post-judgment interest as allowed by law, and all attorneys' fees, costs and expenses incurred by Phillips 66 through trial of this matter.

If you have any questions, please call me immediately.   Otherwise I will proceed as outlined above.

Sincerely yours,

BEIRNE, MAYNARD & PARSONS, L.L.P.

Brian E. Waters

BEIRNE MAYNARD & PARSONS, L.L.P.
AUSTIN · DALLAS · HOUSTON · NEW ORLEANS · SAN ANTONIO

 Pitney Bowes

# ShipRequest™



Ship To:           TMB Enterprises, Inc.

Company:           c/o Thomas Helo

Address 1:         18957 Granada Circle

Address 2:

Address 3:

City:              Porter Ranch

State/Province:    California

ZIP/Postal Code:   91326

Country:           United States

email:

Phone:

Matter #:          107113

Case Name:         P66/TMB

Doc Name:          demand letter

Package Type:      Letter

Address Type:      Commercial

Deliver By:        Mon, June 2, 2014

Atty Initials:     BEW

RECEIVED
MAY 2 9 2014

Special Instructions:            9171 9690 0593 9000 2156 86

Sender Name:       Linda Kimball

email:             lkimball@bmpllp.com

Prepared By:       LMK

Phone:

USPS.com® - USPS Tracking™                                                      Page 1 of 2





Ship a Package ∨      Send Mail ∨      Manage Your Mail

# USPS Tracking™

**Tracking Number: 9171969005939000215686**



## Product & Tracking Information

**Postal Product:**           **Features:**
First-Class Mail®             Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| June 2, 2014 , 1:48 am | Depart USPS Sort Facility | SANTA CLARITA, CA 91383 |

Your item departed our SANTA CLARITA, CA 91383 sort facility on June 2, 2014 at 1:48 am. The item is currently in transit to the destination. Information is updated periodically throughout the day. Please check again later.

| | | |
|---|---|---|
| June 1, 2014 , 9:58 pm | Processed through USPS Sort Facility | SANTA CLARITA, CA 91383 |
| May 29, 2014 | Electronic Shipping Info Received | |

## Track Another Package

**What's your tracking (or receipt) number?**

Track It





# ShipRequest™

| | |
|---|---|
| Ship To: | TMB Enterprises, Inc. |
| Company: | c/o Thomas Helo |
| Address 1: | 18957 Granada Circle |
| Address 2: | |
| Address 3: | |
| City: | Porter Ranch |
| State/Province: | California |
| ZIP/Postal Code: | 91326 |
| Country: | United States |
| email: | |
| Phone: | |
| Matter #: | 107113 |
| Case Name: | P66/TMB |
| Doc Name: | demand letter |
| Package Type: | Letter |
| Address Type: | Commercial |
| Deliver By: | Mon, June 2, 2014 |
| Atty Initials: | BEW |

**RECEIVED MAY 29 2014**

Special Instructions:          9171 9690 0593 9000 2156 86



| | |
|---|---|
| Sender Name: | Linda Kim |
| email: | lkimball@ |
| Prepared By: | LMK |
| Phone: | |

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   c/o Thomas Helo
   TMB Enterprises, Inc.
   18957 Granada Circle
   Porter Ranch, CA 91326

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

   107113
   BEW
   P66/TMB
   demand letter

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)        9171 9690 0593 9000 2156 86

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

BEIRNE, MAYNARD & PARSONS, L.L.P.

1300 POST OAK BOULEVARD

SUITE 2500

HOUSTON, TEXAS 77056-3000

(713) 623-0887

FAX (713) 960-1527

BRIAN E. WATERS

DIRECT DIAL (713) 960-7334
EMAIL: BWATERS@BMPLLP.COM

May 29, 2014

Thomas and Suzanne Helo
18957 Granada Circle
Porter Ranch, CA 91326

*Via CM-RRR and*
*Regular U.S. Mail*

Re:     Personal Guaranty dated June 29, 2009 executed by Thomas and Suzanne Helo

Dear Mr. and Mrs. Helo:

My firm represents Phillips 66 Company ("Phillips 66") in regard to the collection of all amounts TMB Enterprises, Inc. ("TMB Enterprises") owes in connection with the Branded Reseller Agreement dated August 3, 2009 between ConocoPhillips Company ("ConocoPhillips") and TMB Enterprises (the "Agreement").   Pursuant to the Personal Guaranty dated June 29, 2009 (the "Guaranty"), you unconditionally guaranteed all of TMB Enterprises' present and future indebtedness to ConocoPhillips, including all amounts due under the Agreement. ConocoPhillips has assigned the Guaranty and the Agreement to Phillips 66 Company.

From previous correspondence with Phillips 66, you know that TMB Enterprises is in breach of the Agreement and has failed to pay $350,322.98 that is due and owing to Phillips 66. You also know that Phillips 66 has demanded for you to pay this amount which is also due under the Guaranty.    Phillips 66's prior attempts to resolve this matter with you have failed. Consequently, Phillips 66 hereby makes a **FINAL** demand for payment of the amounts owed under the Guaranty.   You are advised that if payment in full is not received in my office within fourteen (14) days from the date of this letter, or if you have not called me to make arrangements to satisfy the outstanding amounts owed by that date, I will advise Phillips 66 to file suit immediately to recover the principal amount owed plus pre- and post-judgment interest as allowed by law, and all attorneys' fees, costs and expenses incurred by Phillips 66 through trial of this matter.

Thomas and Suzanne Helo
May 29, 2014
Page 2

If you have any questions, please call me immediately.  Otherwise I will proceed as
outlined above.

Sincerely yours,

BEIRNE, MAYNARD & PARSONS, L.L.P.

Brian E. Waters

1991974v.1  IMANAGE 107113

 Pitney Bowes

# ShipRequest™



| | |
|---|---|
| Ship To: | Thomas and Suzanne Helo |
| Company: | |
| Address 1: | 18957 Granada Circle |
| Address 2: | |
| Address 3: | |
| City: | Porter Ranch |
| State/Province: | California |
| ZIP/Postal Code: | 91326 |
| Country: | United States |
| email: | |
| Phone: | |
| Matter #: | 107113 |
| Case Name: | P66/TMB |
| Doc Name: | demand letter |
| Package Type: | Letter |
| Address Type: | Commercial |
| Deliver By: | Mon, June 2, 2014 |
| Atty Initials: | BEW |

RECEIVED
MAY 2 9 2014

Special Instructions:        9171 9690 0593 9000 2156 93

| | |
|---|---|
| Sender Name: | Linda Kimball |
| email: | lkimball@bmpllp.com |
| Prepared By: | LMK |
| Phone: | |

USPS.com® - USPS Tracking™                                          Page 1 of 2







# USPS Tracking™

Tracking Number: **9171969005939000215693**



## Product & Tracking Information

**Postal Product:**             **Features:**
First-Class Mail®               Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| May 29, 2014 | Electronic Shipping Info Received | |

The Postal Service was electronically notified by the shipper on May 29, 2014 to expect your package for mailing. This does not indicate receipt by the USPS or the actual mailing date. Delivery status information will be provided when available. No further information is available for this item.

## Track Another Package

What's your tracking (or receipt) number?

 **Pitney Bowes**

# ShipRequest™



| | |
|---|---|
| Ship To: | Thomas and Suzanne Helo |
| Company: | |
| Address 1: | 18957 Granada Circle |
| Address 2: | |
| Address 3: | |
| City: | Porter Ranch |
| State/Province: | California |
| ZIP/Postal Code: | 91326 |
| Country: | United States |
| email: | |
| Phone: | |
| Matter #: | 107113 |
| Case Name: | P66/TMB |
| Doc Name: | demand letter |
| Package Type: | Letter |
| Address Type: | Commercial |
| Deliver By: | Mon, June 2, 2014 |
| Atty Initials: | BEW |



RECEIVED MAY 2 9 2014

Special Instructions:           9171 9690 0593 9000 2156 93

| | |
|---|---|
| Sender Name: | Linda Kim |
| email: | lkimball@ |
| Prepared By: | LMK |
| Phone: | |

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Thomas and Suzanne Helo
18957 Granada Circle
Porter Ranch, CA 91326

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No
   BEW
   P66/TMB
   demand letter

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)        9171 9690 0593 9000 2156 93

PS Form 3811, February 2004     Domestic Return Receipt        102595-02-M-1540

BEIRNE, MAYNARD & PARSONS, L.L.P.

1300 POST OAK BOULEVARD

SUITE 2500

HOUSTON, TEXAS 77056-3000

BRIAN E. WATERS

(713) 623-0887

FAX (713) 960-1527

DIRECT DIAL (713) 960-7334
EMAIL: BWATERS@BMPLLP.COM

May 29, 2014

Thomas and Suzanne Helo
9250 Reseda Blvd, Suite 238
Northridge, CA 91324

*Via CM-RRR and*
*Regular U.S. Mail*

Re:   Personal Guaranty dated June 29, 2009 executed by Thomas and Suzanne Helo

Dear Mr. and Mrs. Helo:

My firm represents Phillips 66 Company ("Phillips 66") in regard to the collection of all amounts TMB Enterprises, Inc. ("TMB Enterprises") owes in connection with the Branded Reseller Agreement dated August 3, 2009 between ConocoPhillips Company ("ConocoPhillips") and TMB Enterprises (the "Agreement").   Pursuant to the Personal Guaranty dated June 29, 2009 (the "Guaranty"), you unconditionally guaranteed all of TMB Enterprises' present and future indebtedness to ConocoPhillips, including all amounts due under the Agreement. ConocoPhillips has assigned the Guaranty and the Agreement to Phillips 66 Company.

From previous correspondence with Phillips 66, you know that TMB Enterprises is in breach of the Agreement and has failed to pay $350,322.98 that is due and owing to Phillips 66. You also know that Phillips 66 has demanded for you to pay this amount which is also due under the Guaranty.   Phillips 66's prior attempts to resolve this matter with you have failed. Consequently, Phillips 66 hereby makes a **FINAL** demand for payment of the amounts owed under the Guaranty.   You are advised that if payment in full is not received in my office within fourteen (14) days from the date of this letter, or if you have not called me to make arrangements to satisfy the outstanding amounts owed by that date, I will advise Phillips 66 to file suit immediately to recover the principal amount owed plus pre- and post-judgment interest as allowed by law, and all attorneys' fees, costs and expenses incurred by Phillips 66 through trial of this matter.

BEIRNE MAYNARD & PARSONS, L.L.P.
AUSTIN · DALLAS · HOUSTON · NEW ORLEANS · SAN ANTONIO

Thomas and Suzanne Helo
May 29, 2014
Page 2

     If you have any questions, please call me immediately.  Otherwise I will proceed as outlined above.

          Sincerely yours,

          BEIRNE, MAYNARD & PARSONS, L.L.P.

          Brian E. Waters

1991976v.1  IMANAGE 107113

 Pitney Bowes

# ShipRequest™



| | |
|---|---|
| Ship To: | Mr. and Mrs. Thomas Helo |
| Company: | |
| Address 1: | 9250 Reseda Blvd. |
| Address 2: | Suite 238 |
| Address 3: | |
| City: | North Ridge |
| State/Province: | California |
| ZIP/Postal Code: | 91324 |
| Country: | United States |
| email: | |
| Phone: | |
| Matter #: | 107113 |
| Case Name: | P66/TMB |
| Doc Name: | demand letter |
| Package Type: | Letter |
| Address Type: | Commercial |
| Deliver By: | Mon, June 2, 2014 |
| Atty Initials: | BEW |

RECEIVED
MAY 2 9 2014

**Special Instructions:**

9171 9690 0593 9000 2157 16

| | |
|---|---|
| Sender Name: | Linda Kimball |
| email: | lkimball@bmpllp.com |
| Prepared By: | LMK |
| Phone: | |

USPS.com® - USPS Tracking™                                    Page 1 of 2

 English    Customer Service     USPS Mobile

 USPS.COM                                    Search USPS.cor

| Ship a Package | Send Mail | Manage Your Mail | Shop |

# USPS Tracking™

   Customer Serv
Have questions?

Tracking Number: **9171969005939000215716**

                                    ✓   DELIVERE

## Product & Tracking Information                    Available Actio

**Postal Product:**                **Features:**
First-Class Mail®                  Certified Mail™                    Text Updates

| | STATUS OF ITEM | LOCATION | Email Updates |
|---|---|---|---|
| **June 2, 2014 , 10:31 am** | Delivered | **NORTHRIDGE, CA 91324** | |

Your item was delivered at 10:31 am on June 2, 2014 in NORTHRIDGE, CA 91324

| May 29, 2014 | Electronic Shipping Info Received | | |

## Track Another Package

**What's your tracking (or receipt) number?**

Track It

LEGAL                        ON USPS.COM              ON ABOUT.USPS.COM        OTHER USPS
Privacy Policy ›             Government Services ›    About USPS Home ›        Business Cust
Terms of Use ›              Buy Stamps & Shop ›      Newsroom ›               Postal Inspec
FOIA ›                      Print a Label with Postage ›  USPS Service Alerts ›    Inspector Gen
No FEAR Act EEO Data ›      Customer Service ›       Forms & Publications ›   Postal Explore
                            Delivering Solutions to the Last Mile ›  Careers ›                National Posta



**Pitney Bowes**

# ShipRequest™



Ship To:            Mr. and Mrs. Thomas Helo
Company:
Address 1:          9250 Reseda Blvd.
Address 2:          Suite 238
Address 3:
City:               North Ridge
State/Province:     California
ZIP/Postal Code:    91324
Country:            United States
email:
Phone:
Matter #:           107113
Case Name:          P66/TMB
Doc Name:           demand letter
Package Type:       Letter
Address Type:       Commercial
Deliver By:         Mon, June 2, 2014
Atty Initials:      BEW



Special Instructions:                        9171 9690 0593 9000 2157 16

Sender Name:        Linda Kimb
email:              lkimball@b
Prepared By:        LMK
Phone:

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   Mr. and Mrs. Thomas Helo
   9250 Reseda Blvd.
   Suite 238
   North Ridge, CA 91324

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent
                          ☐ Addressee
B. Received by ( Printed Name )   C. Date of Delivery
   RAS                            07/19/19
D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No
   BEW

   P66/TMB
   demand letter

3. Service Type
   ☐ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
   (Transfer from service label)          9171 9690 0593 9000 2157 16

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

# EXHIBIT D

**PHILLIPS 66**

**Debit Memo**

| | |
|---|---|
| **Invoice #:** | **946549254** |
| **INVOICE DATE:** | **04/07/2011** |
| **Due Date:** | **05/07/2011** |
| **Account #:** | **10092601** |
| **Pay Method:** | EFT |
| **Terms:** | Net 30 Days From Invoice Date |
| **Sales Info:** | NAW1-N2-NWCA W11-NAW075 |
| **Contract #** | |

Phillips 66 Company
Federal Tax ID ▮▮▮▮▮▮

**Bill To:** 10092601
TMB ENTERPRISES INC
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Ship To:** 855076
DELETED 3/31/2011
TMB ENTERPRISES INC
DBA SUN VALLEY 76
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Loading #:**

**Remittance Instructions:**
DO NOT PAY
Your account will be drafted on
the invoice due date or next
valid draft date.

| | | |
|---|---|---|
| **Transaction Date: 04/06/2011** | **Transp:** | |
| **BOL #:** GLB855076A | **Brand:** | 76 |
| **Plant:** SUN VALLEY, CA | | |
| **INCO Terms:** Service-No Delivery Required | | |
| **Order #:** 74654419 | | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 10772596 | Self Am Principal - NQ Final Billing Principle | 1 | 93,782.97 | $93,782.97 |
| Total | | | | $93,782.97 |
| | **Invoice Total** | | | **$93,782.97** |
| | Discount Amount | | | |
| | **Amount Due** | | | **$93,782.97** |

**For billing questions please call 918-661-5686**

05/21/2014 08:04:29                     PSX-PRD-010                     ZAS1-RVADIN01-Z_RVINVOICE03

# PHILLIPS 66

**Debit Memo**

| | |
|---|---|
| **Invoice #:** | **946549256** |
| **INVOICE DATE:** | **04/07/2011** |
| **Due Date:** | **05/07/2011** |
| **Account #:** | **10092601** |
| **Pay Method:** | EFT |
| **Terms:** | Net 30 Days From Invoice Date |
| **Sales Info:** | NAW1-N2-NWCA W11-NAW075 |
| **Contract #** | |

Phillips 66 Company
Federal Tax ID ▮▮▮▮▮

**Bill To:** 10092601
TMB ENTERPRISES INC
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Ship To:** 855076
DELETED 3/31/2011
TMB ENTERPRISES INC
DBA SUN VALLEY 76
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Loading #:**

**Remittance Instructions:**
DO NOT PAY
Your account will be drafted on the invoice due date or next valid draft date.

---

| | |
|---|---|
| **Transaction Date: 04/06/2011** | Transp: |
| **BOL #:** GLB855076B | **Brand:** 76 |
| **Plant:** SUN VALLEY, CA | |
| **INCO Terms:** Service-No Delivery Required | |
| **Order #:** 74654420 | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 10772597 | Self Am Interest - NQ | 1 | 2,286.76 | $2,286.76 |
| | Final Billing Interest Q12011 | | | |
| Total | | | | $2,286.76 |
| | **Invoice Total** | | | **$2,286.76** |
| | Discount Amount | | | |
| | **Amount Due** | | | **$2,286.76** |

**For billing questions please call 918-661-5686**

05/21/2014 08:04:31                    PSX-PRD-010                    ZAS1-RVADIN01-Z_RVINVOICE03

**PHILLIPS 66**

Phillips 66 Company
Federal Tax ID ▮▮▮▮▮▮

**Debit Memo**                                                  Page 1 of     1

| | |
|---|---|
| **Invoice #:** | **946549266** |
| **INVOICE DATE:** | **04/07/2011** |
| **Due Date:** | **05/07/2011** |
| **Account #:** | **10092601** |
| **Pay Method:** | EFT |
| **Terms:** | Net 30 Days |
| | From Invoice Date |
| **Sales Info:** | NAW1-N2-NWCA |
| | W11-NAW075 |
| **Contract #** | |

**Bill To:** 10092601
TMB ENTERPRISES INC
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Ship To:** 855076
DELETED 3/31/2011
TMB ENTERPRISES INC
DBA SUN VALLEY 76
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Loading #:**

**Remittance Instructions:**
DO NOT PAY
Your account will be drafted on
the invoice due date or next
valid draft date.

---

| | | |
|---|---|---|
| **Transaction Date: 04/06/2011** | | Transp: |
| **BOL #:** | GLB10092601 | **Brand:**      76 |
| **Plant:** | SUN VALLEY, CA | |
| **INCO Terms:** | Service-No Delivery Required | |
| **Order #:** | 74654424 | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 11351892 | LIQ DAM - RSLR CONTRACT | 1 | 363,945.21 | $363,945.21 |
| | Reseller Liquidated Damages | | | |
| Total | | | | $363,945.21 |
| | **Invoice Total** | | | **$363,945.21** |
| | Discount Amount | | | |
| | **Amount Due** | | | **$363,945.21** |

**For billing questions please call 918-661-5319**

05/21/2014 08:04:32                          PSX-PRD-010                          ZAS1-RVADIN01-Z_RVINVOICE03

# PHILLIPS 66

**Debit Memo**

Phillips 66 Company
Federal Tax ID ███████

| | |
|---|---|
| **Invoice #:** | **948395161** |
| **INVOICE DATE:** | **09/15/2011** |
| **Due Date:** | **09/20/2011** |
| **Account #:** | **10092601** |
| **Pay Method:** | EFT |
| **Terms:** | Net 5 Days |
| | From Invoice Date |
| **Sales Info:** | NAW1-N2-NWCA |
| | W11-NAW075 |
| **Contract #** | |

**Bill To:** 10092601
TMB ENTERPRISES INC
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Ship To:** 855076
DELETED 3/31/2011
TMB ENTERPRISES INC
DBA SUN VALLEY 76
12904 ROSCOE BLVD
SUN VALLEY CA  91352

**Loading #:**

**Remittance Instructions:**
DO NOT PAY
Your account will be drafted on
the invoice due date or next
valid draft date.

| | | | |
|---|---|---|---|
| **Transaction Date: 09/14/2011** | | Transp: | |
| **BOL #:** | GLB855076091211 | **Brand:** | 76 |
| **Plant:** | SUN VALLEY, CA | | |
| **INCO Terms:** | Service-No Delivery Required | | |
| **Order #:** | 74963110 | | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 11351888 | IMAGE & EQUIP MONIES | 1 | 65,010.95 | $65,010.95 |
| | TMB Enterprises Image and Equipment balance | | | |
| Total | | | | $65,010.95 |
| | **Invoice Total** | | | **$65,010.95** |
| | Discount Amount | | | |
| | **Amount Due** | | | **$65,010.95** |

**For billing questions please call 918-661-1446**