UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAY LEE BRAY, | ) Case No. EDCV 14-1772-JPR |
| Plaintiff, | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| v. | ) **AFFIRMING COMMISSIONER** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed July 23, 2015, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

**II.   BACKGROUND**

Plaintiff was born in 1964.  (Administrative Record ("AR") 141.)  In a Disability Report he stated that he completed one year of college and worked in construction.  (AR 160.)[1]

On February 9, 2011, Plaintiff filed applications for DIB and SSI (AR 141, 145), alleging that he had been unable to work since April 11, 2009, because of severe asthma and ankle and back problems (AR 159).  After his applications were denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge.  (AR 79.)  A hearing was held on September 17, 2012, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 39-59.)  In a written decision issued September 27, 2012, the ALJ found Plaintiff not disabled.  (AR 19-32.)  On May 13, 2014, the Appeals Council denied Plaintiff's request for review.  (AR 4.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at

---

[1] At the hearing before the ALJ, however, Plaintiff stated that he completed seven years of college total at two different schools but didn't graduate from either.  (AR 41.)

2

401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).
It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."   Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1996).   "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for that of the Commissioner.   Id. at
720-21.

**IV.   THE EVALUATION OF DISABILITY**

        People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.   42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

        A.   The Five-Step Evaluation Process

        The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.   20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,
828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first
step, the Commissioner must determine whether the claimant is
currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.

1  §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

2      If the claimant is not engaged in substantial gainful
3  activity, the second step requires the Commissioner to determine
4  whether the claimant has a "severe" impairment or combination of
5  impairments significantly limiting his ability to do basic work
6  activities; if not, the claimant is not disabled and his claim
7  must be denied.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

8      If the claimant has a "severe" impairment or combination of
9  impairments, the third step requires the Commissioner to
10  determine whether the impairment or combination of impairments
11  meets or equals an impairment in the Listing of Impairments
12  ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix
13  1; if so, disability is conclusively presumed.
14  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

15      If the claimant's impairment or combination of impairments
16  does not meet or equal an impairment in the Listing, the fourth
17  step requires the Commissioner to determine whether the claimant
18  has sufficient residual functional capacity ("RFC")[2] to perform
19  his past work; if so, he is not disabled and the claim must be
20  denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant
21  has the burden of proving he is unable to perform past relevant
22  work.  Drouin, 966 F.2d at 1257.  If the claimant meets that
23  burden, a prima facie case of disability is established.  Id.

24      If that happens or if the claimant has no past relevant
25  work, the Commissioner then bears the burden of establishing that

26  _____

27      [2] RFC is what a claimant can do despite existing exertional
28  and nonexertional limitations.  §§ 404.1545, 416.945; see Cooper
    v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

the claimant is not disabled because he can perform other
substantial gainful work available in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.
That determination comprises the fifth and final step in the
sequential analysis.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v);
<u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

      B.   <u>The ALJ's Application of the Five-Step Process</u>

     At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since April 11, 2009, the alleged
onset date.  (AR 21.)  At step two, he concluded that Plaintiff
had the severe impairment of degenerative disc disease of the
lumbar spine with radiculopathy.[3]  (<u>Id.</u>)  At step three, the ALJ
determined that Plaintiff's impairments did not meet or equal a
listing.  (AR 24.)  At step four, he found that Plaintiff had the
RFC to perform light work with additional restrictions.  (AR 24-
25.)  Specifically, Plaintiff could lift, carry, push, or pull 20
pounds occasionally and 10 pounds frequently.  (AR 24.)  He could
stand and walk for at least two hours and sit for about six hours
of an eight-hour day.  (<u>Id.</u>)  He could occasionally perform
postural activities such as climbing, balancing, stooping,
kneeling, crouching, and crawling but could not climb ladders,
ropes, or scaffolds.  (<u>Id.</u>)  He was also to "avoid even moderate
exposure to irritants such as fumes, odors, dusts and gases."
(AR 25.)  Based on the VE's testimony, the ALJ concluded that
Plaintiff could not perform his past relevant work as a

---

[3] The ALJ found that Plaintiff's other alleged impairments
were not severe (AR 21-24), which Plaintiff does not challenge.

construction superintendent.  (AR 29-30.)  At step five, the ALJ
found that Plaintiff could perform jobs existing in significant
numbers in the national economy.  (AR 30.)  Accordingly, he found
him not disabled.  (AR 31.)

**V.  DISCUSSION**

Plaintiff claims that the ALJ erred in assessing the
opinions of two treating physicians and Plaintiff's credibility.
(J. Stip. at 4.)  For efficiency, the Court addresses Plaintiff's
contentions in reverse order.

A.  The ALJ Properly Assessed Plaintiff's Credibility

1.  Applicable law

An ALJ's assessment of symptom severity and claimant
credibility is entitled to "great weight."  See Weetman v.
Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v.
Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24,
1986).  "[T]he ALJ is not 'required to believe every allegation
of disabling pain, or else disability benefits would be available
for the asking, a result plainly contrary to 42 U.S.C.
§ 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th
Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.
1989)).

In evaluating a claimant's subjective symptom testimony, the
ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d
at 1035-36.  "First, the ALJ must determine whether the claimant
has presented objective medical evidence of an underlying
impairment '[that] could reasonably be expected to produce the
pain or other symptoms alleged.'"  Id. at 1036 (quoting Bunnell
v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  If

such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.[4] Brown-Hunter v. Colvin, __ F.3d __, No. 13-15213, 2015 WL 6684997, at *5 (9th Cir. Nov. 3, 2015); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin., 795 F.3d 1177, 1186 (9th Cir. 2015); Thomas v. Barnhart,

---

[4] Defendant objects to the clear-and-convincing standard but acknowledges that her argument was rejected in Burrell v. Colvin, 775 F.3d 1133, 1136-37 (9th Cir. 2014). (J. Stip at 29 n.7); see Brown-Hunter v. Colvin, __ F.3d __, No. 13-15213, 2015 WL 6684997, at *5 (9th Cir. Nov. 3, 2015) (reaffirming Burrell).

278 F.3d 947, 958-59 (9th Cir. 2002).  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  <u>Thomas</u>, 278 F.3d at 959.

## 2.  Relevant background

At the hearing, Plaintiff testified that he had had lower-back pain for several years before February 2009, when he hurt his back trying to lift a manhole cover off a truck at a construction site.  (AR 47-48.)  After the incident, he could not get out of bed and took Oxycontin twice a day for 30 days, which seemed to help.  (AR 48.)

Plaintiff testified that he had lower-back pain every day, and it lasted all day but at different levels.  (AR 49.)  On a scale of zero to 10, level three was a "good day" and he could "handle" level five, but he had a "hard time" when the pain was "severe," at level seven.  (<u>Id.</u>)  He testified that he could sit for a maximum of two hours and stand for an hour or two.  (AR 44.)  He stated that he could "lift anything" but would "pay for it" in pain.  (AR 45.)  The farthest he could walk was a block around his house.  (AR 44-45.)

Plaintiff also testified that he had shooting pain down his right leg, and if he used his feet, he had pain down his left leg and in his lower back.  (AR 53.)  He also experienced sudden lower-back spasms.  (AR 54.)

Plaintiff testified that he was taking several pain medications, including oxycodone, Soma, Norvasc, fentanyl patches, and Meloxicam but was going to discontinue Meloxicam because it wasn't helping.  (AR 49-50, 55.)  He wanted to change

8

his doctor because he thought his medications weren't managing his pain.  (AR 50.)  Other than feeling groggy and being unable to concentrate to read, he did not have any side effects from his pain medication.  (AR 52.)  He testified that his doctors had discussed surgery with him, but he did not want it because they told him there was a 70 percent chance it would not be successful.  (AR 46-47.)

Plaintiff appeared at the hearing in a wheelchair, and he testified that he used it when he knew he would be "up" for two to three hours, which happened about five times a month.  (AR 42.)  He had difficulty showering and bathing but sometimes tried to help with housework, cleaning, and grocery shopping.  (AR 42-43.)

### 3.  Analysis

The ALJ found Plaintiff "partially credible because he has some limitations, but not to the extent alleged."  (AR 25.)  As discussed below, he provided clear and convincing reasons for doing so.

The ALJ discounted Plaintiff's testimony because his alleged symptoms and limitations were "inconsistent with the objective medical evidence, which indicates an attempt by [Plaintiff] to exaggerate the severity of his symptoms."  (AR 25.)  He first noted that the record contained no treatment notes from April 2009, the alleged onset date, to mid-2010.  (AR 26.)  Further, although treatment records from July 2010 to August 2012 showed that Plaintiff had tenderness and decreased range of motion in his lower extremities, they also documented many instances of negative or only mildly positive straight-leg raises, normal

motor strength, and only mildly reduced sensation.  For example,
every treatment note from Plaintiff's physician at Global Pain
Care from November 2011 to August 2012 indicated that Plaintiff
had motor strength of five of five and was negative for straight-
leg raise in both legs.  (AR 535, 538, 541, 544, 547, 550, 553,
556, 559, 562, 565.)  Additionally, Plaintiff's three visits to
the neurosurgery clinic at Arrowhead Regional Medical Center, in
October 2011, April 2012, and August 2012, showed motor strength
of five of five in upper and lower extremities (AR 484, 506,
567), "very mildly reduced" sensation in the right leg (AR 484),
and negative or only mildly positive results for straight-leg
raising (AR 506 (mildly positive in right, negative in left), 567
(negative in right and left)).  The ALJ also noted that despite
Plaintiff's "extreme" description of the severity of his pain,
there was no evidence of muscle atrophy in the record.  (AR 26);
see Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (as
amended) (affirming ALJ's discounting of claimant's allegations,
including that claimant "did not exhibit muscular atrophy");
Spurlock v. Colvin, No. EDCV 14-01521-JEM, 2015 WL 1735196, at *8
(C.D. Cal. Apr. 16, 2015) (finding that lack of muscle atrophy is
legitimate consideration in evaluating claimant's credibility).
The ALJ was entitled to consider the lack of objective medical
evidence in assessing Plaintiff's credibility.  See Burch v.
Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of
medical evidence cannot form the sole basis for discounting pain
testimony, it is a factor that the ALJ can consider in his
credibility analysis."); Carmickle v. Comm'r, Soc. Sec. Admin.,
533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the

medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence").

The ALJ also discredited Plaintiff's allegations because the record showed that he received "routine conservative treatment for complaints [of] back and leg pain." (AR 26.) Specifically, the "lack of more aggressive treatment such as surgical intervention suggest[ed] [Plaintiff's] symptoms and limitations were not as severe as he alleged." (Id.) Indeed, in June 2011, a physician at the orthopedic clinic told Plaintiff that surgical intervention was "not appropriate" and advised him to continue his pain-management regimen with his primary-care physician. (AR 525.) In October 2011, Plaintiff went to the neurosurgery clinic for surgery evaluation, but examination results were generally unremarkable, and the physician noted that Plaintiff needed a new MRI because the most recent MRI was a year old and his symptoms were "waxing and waning." (AR 506.) But Plaintiff did not get another MRI until five months later, on March 14, 2012 (AR 502), which he presented at his next visit to the neurosurgery clinic, on April 5, 2012 (AR 484). Even after reviewing the MRI's results of multilevel degenerative disc disease and posterior degenerative facet-joint disease (AR 502), the neurosurgery specialist concluded that "no neurosurgery intervention is indicated" and that Plaintiff required "strenuous physical therapy" instead (AR 485). He further noted that the physical therapy Plaintiff had tried "was not professional physical therapy and it was only done through [Plaintiff's] friend." (AR

11

484.)  He also indicated that Plaintiff appeared "very strong"
and that "since [Plaintiff] is an athlete, physical therapy can
truly be beneficial to him."  (AR 484-85.)  Four months later, in
August 2012, a different physician at the same neurosurgery
clinic noted that Plaintiff had failed to do the physical therapy
that was prescribed at his last visit.[5]  (AR 567.)  As before,
the doctor did not recommend surgery and instead advised
Plaintiff to do physical and occupational therapy and to continue
treatment with pain medication.  (AR 567-68.)  As the ALJ noted,
this evidence contradicted Plaintiff's testimony that his doctors
had recommended surgery but he declined to pursue it because
there was a 70 percent chance it would not be successful.  (AR
46-47.)

Plaintiff also states that he "was not a candidate for
surgery because of his other multiple problems."  (J. Stip. at
25.)  Although an orthopedic specialist advised against surgery
in June 2011 because of Plaintiff's unspecified "multiple
problems" (AR 525), later, in April and August 2012, neurosurgery
specialists did not mention any such issues in concluding that
surgery was not appropriate (see AR 485, 567).  Instead, they
noted "no neurosurgical lesion at this time amenable with
surgery" (AR 567), prescribed continued conservative treatment
with pain medication, physical therapy, and possible injections
(AR 485, 567), and concluded that Plaintiff did "not need any
further neurosurgical followup" (AR 567).  See Riddell v. Astrue,

---

[5] Plaintiff told the doctor he never received the referral
for physical therapy.  (AR 567.)

No. 3:11-CV-381-BR, 2012 WL 1151585, at *8 (D. Or. Apr. 5, 2012) (ALJ properly based credibility determination on conservative treatment when no physician recommended surgery, including neurosurgeon who found that claimant was "neurologically intact" and "no instability in the cervical spine" accounted for his neck pain); Martinez v. Colvin, No. CV 13-6741-SH, 2014 WL 2533784, at *3 (C.D. Cal. June 5, 2014) (ALJ properly discounted claimant's testimony based on conservative treatment when no physician recommended surgery and claimant was treated with "pain management" and epidural injections).

The ALJ also stated that although Plaintiff testified that he needed to use a wheelchair five times a month, there was no evidence in the record that a physician ever actually prescribed one.  (AR 26; see AR 42.)  In fact, a doctor apparently ordered a wheelchair for Plaintiff.  (See AR 414, 423, 430, 456.)  But the doctor who ordered the wheelchair is the same doctor whose assessments of Plaintiff's condition the ALJ properly rejected, as explained in the next section, and thus any error in the ALJ's statement was harmless.  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless when it is "inconsequential to the ultimate nondisability determination"); see also Molina, 674 F.3d at 1115.

Finally, as the ALJ noted, although Plaintiff's prescriptions for "strong narcotic medication weigh[ed] in [his] favor," the record indicates that his medications were "relatively effective in controlling [his] symptoms with

13

1   occasional adjustments," which was contrary to his testimony.[6]

2   (AR 26; see, e.g., AR 537, 540, 543, 549, 552, 558, 561.)

3   Plaintiff also received epidural injections and radiofrequency

4   neurotomies, which were sometimes helpful.[7] (See AR 252

5   (Plaintiff reporting "marked improvement" after Dec. 2010

6   radiofrequency neurotomy), 271 (in Sept. 2010, Plaintiff

7   reporting that epidural injections in past several years had

8   relieved pain), 322 (June 2011 injection provided 30 percent pain

9   relief), 555 (Jan. 2012 injection provided 20 to 30 percent pain

10  relief for two weeks), 558 (Dec. 2011 injection provided 20 to 30

11  percent pain relief for two weeks).)

12       That orthopedic and neurosurgery specialists recommended

13  treatment with only pain medication and physical therapy was a

14  clear and convincing basis on which to discount Plaintiff's

---

16       [6] Several physicians expressed suspicion that Plaintiff
17  might be abusing or diverting his narcotic pain medication. (See
AR 207-08 (on Aug. 19, 2010, emergency-room physician writing,
18  "need to get DOJ report" in notes and noting that Plaintiff was
"very aggressive" in requesting "refill of narcotics" given two
19  weeks earlier because he had allegedly lost them), 203 (on Sept.
3, 2010, physician refusing to refill pain medication and
20  explaining to Plaintiff that he had received several pain
medications in August), 201 (on Sept. 17, 2010, physician
21  reminding Plaintiff to see only one doctor for change in
medication), 272 (on Sept. 27, 2010, nurse practitioner telling
22  Plaintiff he would receive no early refills and advising him not
to engage in further "diversional behavior"), 522 (on July 3,
23  2011, emergency-room physician advising Plaintiff that "ER is not
the place for chronic pain [treatment] or refills").)
24

25       [7] Radiofrequency neurotomy is a procedure for reducing back
and neck pain using heat generated by radio waves to interfere
26  with nerves' ability to transmit pain signals. See
Radiofrequency neurotomy, Mayo Clinic, http://www.mayoclinic.org/
27  tests-procedures/radiofrequency-neurotomy/basics/definition/
PRC-20013452?p=1 (last updated Nov. 26, 2014).
28

complaints of disabling pain.   See Tommasetti v. Astrue, 533 F.3d
1035, 1040 (9th Cir. 2008) (that claimant "did not seek an
aggressive treatment plan" and had favorable response to
conservative treatment with physical therapy, transcutaneous-
electrical-nerve-stimulation unit, lumbosacral corset, and anti-
inflammatory medication undermined allegations of disabling
impairment); Parra, 481 F.3d at 751 (evidence of conservative
treatment sufficient to discount claimant's testimony regarding
severity of impairment); Walter v. Astrue, No. EDCV 09–1569 AGR,
2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly
discredited claimant's allegations based on conservative
treatment consisting of medication, physical therapy, and
injection).   Even if Plaintiff's injections and narcotic pain
medication constituted nonconservative care, any error was
harmless given the ALJ's reliance on Plaintiff's inconsistent
statements about surgery and his daily activities, as explained
below, and the neurosurgeons' prescribed conservative care.   See
Carmickle, 533 F.3d at 1162-63 (finding error harmless when ALJ
cited other reasons to support credibility determination).

    Additionally, the ALJ refused to credit Plaintiff's
allegations that his daily activities were "fairly limited"
because they could not "be objectively verified with any
reasonable degree of certainty" and it was "difficult to
attribute that degree of limitation to [Plaintiff's] medical
condition, as opposed to other reasons, in view of the relatively
weak medical evidence and other factors discussed."   (AR 26.)
Plaintiff may be correct that the ALJ improperly discounted his
testimony concerning his daily activities because it could not be

15

objectively verified.   See Altamirano v. Colvin, No. ED CV 12-1862-PLA, 2013 WL 3863956, at *7 (C.D. Cal. July 24, 2013) (noting that "[o]bjective verifiability to a reasonable degree of certainty is not a requirement imposed by law" (citation omitted)); Baxla v. Colvin, 45 F. Supp. 3d 1116, 1128 (D. Ariz. 2014) ("that '"a fact cannot be verified objectively provides little evidence to support the conclusion that the individual is not being truthful about such fact in any particular instance"'" (citation omitted)), appeal docketed, No. 14-17222 (9th Cir. Nov. 7, 2014).   But he correctly found that Plaintiff's daily activities do not appear to have been as limited as he alleged. As the ALJ noted in particular, in October 2011, Plaintiff reported that he was "extremely involved in sports" but had been "taking it easy" in the last six weeks, and as a result, his pain had improved.   (AR 506.)   The doctor advised that he "take precaution when doing excessive physical activity, including fighting, jujitsu, walking, or any other physical activities that he states he does for an extended period of time."   (AR 506-07.) Moreover, in April 2012, Plaintiff reported that he could exercise for 25 minutes and that he used to run three miles but now was capable only of walking six miles.   (AR 484.)   Less than six months later, Plaintiff testified that he could walk no more than around the block.   (AR 44-45.)

As discussed above, the ALJ was entitled to discount Plaintiff's allegations based on a lack of objective medical evidence, the inconsistent statements surrounding his surgery and daily activities, and, possibly, the conservative treatment regimen prescribed by Plaintiff's physicians.   In sum, the ALJ

provided clear and convincing reasons for finding Plaintiff partially credible.  Because those findings were supported by substantial evidence, this Court may not engage in second-guessing.  <u>See</u> <u>Thomas</u>, 278 F.3d at 959.  Plaintiff is not entitled to remand on this ground.

      B.   <u>The ALJ Properly Assessed the Treating Physicians'</u> <u>Opinions</u>

Plaintiff contends that the ALJ erred in assessing the opinions of treating physicians Andres de la Llana and Nasrin Lopa.  (J. Stip. at 4-10.)  For the reasons discussed below, remand is not warranted.

      1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen</u>, 80 F.3d at 1285.  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  §§ 404.1527(c)(2), 416.927(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship,

frequency of examination, nature and extent of the treatment

relationship, amount of evidence supporting the opinion,

consistency with the record as a whole, the doctor's area of

specialization, and other factors.  §§ 404.1527(c)(2)-(6),

416.927(c)(2)-(6).

When a treating physician's opinion is not contradicted by

other evidence in the record, it may be rejected only for "clear

and convincing" reasons.  See Carmickle, 533 F.3d at 1164 (citing

Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ

must provide only "specific and legitimate reasons" for

discounting it.  Id. (citing Lester, 81 F.3d at 830-31).

Furthermore, "[t]he ALJ need not accept the opinion of any

physician, including a treating physician, if that opinion is

brief, conclusory, and inadequately supported by clinical

findings."  Thomas, 278 F.3d at 957; accord Batson v. Comm'r of

Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

2.  Relevant background

Dr. de la Llana treated Plaintiff for his lower-back pain

from April to June 2011.  (AR 319-35.)  On April 18, 2012, nearly

a year later, he completed an Authorization to Release Medical

Information form, apparently in connection with Plaintiff's

application for state welfare benefits.  (AR 442.)  On the form,

he checked a box indicating that Plaintiff was unable to work.

(Id.)  In an attached Physical Capacities form, Dr. de la Llana

opined that Plaintiff could sit and stand or walk no more than

two hours each a day.  (AR 443.)  Plaintiff was not restricted in

using his hands or fingers for repetitive motions but was

restricted in using his feet for such motions because of muscle

spasms caused by prolonged standing and operating of foot controls.   (Id.)   Dr. de la Llana opined that Plaintiff could not lift or carry even 10 pounds and could not climb, stoop, kneel, crouch, crawl, or reach from below knees to chest.  (AR 444.)   He could occasionally balance and reach from chest to above shoulders.   (Id.)

The ALJ gave "less weight" to Dr. de la Llana's opinion because it reported "extremely severe limitations, but his treatment notes fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Plaintiff] were in fact disabled."  (AR 28.)   The ALJ noted that Dr. de la Llana's opinion "contrasts sharply with the other evidence of record and is without substantial support from the other evidence of record."  (Id.)

Plaintiff saw Dr. Lopa on February 16, 2011, for a referral to a pain-management specialist.  (AR 339-41.)   He saw her again on February 24, 2011, for follow-up on lab work and requested that she fill out a form for "social service cash aid."  (AR 336.)   That form was an Authorization to Release Medical Information form identical to the one completed by Dr. de la Llana.  (AR 447.)   On the form, Dr. Lopa checked boxes indicating that Plaintiff was unable to work and had functional limitations that affected his ability to work.  (Id.)   Unlike Dr. de la Llana, however, Dr. Lopa did not attach a Physical Capacities form specifying what those limitations were.

3.   <u>Analysis</u>

Dr. de la Llana's opinion was contradicted by the opinions of the nonexamining state-agency physicians, who opined that

19

Plaintiff could lift or carry 20 pounds occasionally and 10
pounds frequently and could stand or walk for at least two hours
of an eight-hour workday, among other limitations.[8]  (AR 303,
355.)  Dr. de la Llana was also contradicted by one of the
neurosurgery specialists who examined Plaintiff, who told
Plaintiff to "take precaution when doing excessive physical
activity" but did not limit him in any daily activity.  (AR 506-
07.)  Thus, the ALJ was required to give specific and legitimate
reasons supported by substantial evidence for rejecting Dr. de la
Llana's opinion, see Carmickle, 533 F.3d at 1164, which he did.

The ALJ properly gave "less weight" to Dr. de la Llana's
opinion because it was not supported by his treatment notes,
which did not document "the type of significant clinical and
laboratory abnormalities one would expect if [Plaintiff] were in
fact disabled."  (AR 28.)  Indeed, in the five times Dr. de la
Llana saw Plaintiff from April to June 2011, he reviewed only one

---

[8] Plaintiff asserts that the nonexamining state-agency
physicians found him capable only of sedentary work, not light
work.  (J. Stip. at 5.)  Although the state-agency physician on
initial consideration did indicate a sedentary RFC in his Case
Analysis (AR 309), he also opined on a separate Physical Residual
Functional Capacity Assessment form that Plaintiff was capable of
lifting or carrying 20 pounds occasionally and 10 pounds
frequently (AR 303), which was consistent with the Social
Security Administration's definition of light work, see
§§ 404.1567(b), 416.967(b) ("Light work involves lifting no more
than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds."); §§ 404.1567(a), 416.967(a)
("Sedentary work involves lifting no more than 10 pounds at a
time . . . .").  The state-agency physician on reconsideration
affirmed the "prior physical RFC as written" but did not resolve
the discrepancy.  (AR 355.)  The discrepancy appears to have been
a clerical error.  Indeed, the ALJ reasonably interpreted the
state-agency physicians' findings as determining that Plaintiff
could perform light work, not sedentary work.  (See AR 29.)

1  imaging test: a year-old MRI of his lower back, which showed a
2  herniated disc at L5-S1 with mass effect on sacral nerve roots
3  but no significant central-canal stenosis of the lumbar spine.
4  (See AR 322.)  Other than observations that Plaintiff had
5  significant tenderness on palpation of his lower back and had
6  intact knee reflexes, Dr. de la Llana did not record any clinical
7  findings in his treatment notes supporting the functional
8  limitations he assessed.  (See AR 320, 324, 328, 331-32, 334-35.)
9  Indeed, his treatment of Plaintiff consisted mainly of refilling
10 his pain medication while he continued treatment at a pain-
11 management clinic (AR 324, 329) and referring him to specialists
12 in neurosurgery and orthopedics (AR 321, 324, 332).  Accordingly,
13 the ALJ's finding that Dr. de la Llana's opinion was not
14 supported by his own treatment notes was specific and legitimate
15 and supported by substantial evidence.  See §§ 404.1527(c)(3),
16 416.927(c)(3) (more weight given "[t]he more a medical source
17 presents relevant evidence" and "[t]he better an explanation" it
18 provides to support its opinion); Connett v. Barnhart, 340 F.3d
19 871, 875 (9th Cir. 2003) (treating physician's opinion properly
20 rejected when treatment notes "provide[d] no basis for the
21 functional restrictions he opined should be imposed on
22 [claimant]"); Thomas, 278 F.3d at 957 ("The ALJ need not accept
23 the opinion of any physician, including a treating physician, if
24 that opinion is . . . inadequately supported by clinical
25 findings.").

26     The ALJ also accorded less weight to Dr. de la Llana's
27 opinion because it "contrast[ed] sharply with" and was not
28 supported by other evidence in the record.  (AR 28.)  Indeed, as

the ALJ noted, other evidence in the record showed "relatively
benign findings." (Id.)  For example, as discussed in Section
V.A, numerous treatment notes in the record indicated that
Plaintiff had straight-leg raises that were negative or only
mildly positive, normal motor strength, and very mildly reduced
sensation in his lower extremities. (See AR 484, 506, 535, 538,
541, 544, 547, 550, 553, 556, 559, 562, 565, 567.)  Thus, the
ALJ's finding that Dr. de la Llana's opinion was inconsistent
with the record was specific and legitimate and supported by
substantial evidence.  See §§ 404.1527(c)(4), 416.927(c)(4) (more
weight given "the more consistent an opinion is with the record
as a whole"); Batson, 359 F.3d at 1195 ("an ALJ may discredit
treating physicians' opinions that are conclusory, brief, and
unsupported by the record as a whole . . . or by objective
medical findings").

     Plaintiff argues that the ALJ erred in failing to address
the opinion of treating physician Lopa. (J. Stip. at 7-10 & n.2;
see AR 447.)  Although the ALJ erred by not doing so, the error
was harmless.  See Marsh v. Colvin, 792 F.3d 1170, 1172-73 (9th
Cir. 2015) (holding that ALJ errs if he "totally ignore[s]"
treating-physician opinion but harmless-error analysis applies).
Dr. Lopa's one-page opinion consisted only of checked-off boxes
indicating that Plaintiff was not able to work and had functional
limitations, without specifying what those limitations were. (AR
447); cf. Molina, 674 F.3d at 1111 (ALJ may "permissibly reject
check-off reports that do not contain any explanation of the
bases of their conclusions" (alterations and citation omitted)).
Further, Dr. Lopa completed the form after seeing Plaintiff only

two times total, over a two-week period, beginning about a week
after Plaintiff filed his Social Security applications.  (AR 339-
41 (on Feb. 16, 2011, Plaintiff requesting "referral to pain
management"), 336 (on Feb. 24, 2011, Plaintiff requesting "form
fill out for social service cash aid")); see Dominguez v. Colvin,
927 F. Supp. 2d 846, 858-59 (C.D. Cal. 2013) (ALJ properly
rejected treating-source opinion when physician completed
medical-source statement after seeing claimant only twice); cf.
Marsh, 792 F.3d at 1171-72 (error not harmless because ALJ failed
to mention progress notes spanning three years).  And, as with
Dr. de la Llana, Dr. Lopa's treatment of Plaintiff in those two
sessions consisted only of referring him to a pain-management
specialist, refilling his medications, and prescribing
"conservative therapy" with massage, a warm compress, and
exercise as tolerated.  (AR 338, 341.)  Indeed, Dr. Lopa
recommended that Plaintiff perform "brisk walking" for 30 minutes
a day at least five days a week (along with other exercise) (AR
341), contradicting Plaintiff's testimony that he could walk only
around the block.  Thus, her treatment notes failed to provide
any clinical support for the functional limitations she assessed
on the Authorization to Release Medical Information form.  See
§§ 404.1527(c)(3), 416.927(c)(3); Connett, 340 F.3d at 875;
Thomas, 278 F.3d at 957.  Accordingly, the ALJ's failure to
address Dr. Lopa's opinion was harmless.

　　　　Plaintiff is not entitled to remand on this ground.[9]

_____

[9] Plaintiff claims that the ALJ should have ordered a
consultative examination.  (J. Stip. at 9.)  An ALJ has broad
                                            (continued...)

## VI.  CONCLUSION

Consistent with the foregoing, and under sentence four of 42 U.S.C. § 405(g),[10] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice. IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: November 17, 2015

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[9] (...continued) discretion in determining whether to order a consultative examination and may do so when "ambiguity or insufficiency in the evidence . . . must be resolved." Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001) (citation omitted); §§ 404.1519a(b), 416.919a(b).  Here, the ALJ found the evidence sufficient to support a decision.  (See AR 29.)  He determined that Plaintiff was capable of a limited range of light work after reviewing medical-opinion evidence not only from Dr. de la Llana and the nonexamining state-agency physicians but also from Jamshid Mistry, a neurosurgery specialist, and from a physician's assistant to Zoheir El-Hajjanoi, M.D., who both concluded only that Plaintiff should reduce excessive physical activity.  (See AR 226, 506-07.)  Thus, the ALJ was not required to order a consultative examination.

[10] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

24